[No. A051967. First Dist., Div. Three. Mar. 25, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
JEFFREY ALLEN WALLACE, Defendant and Appellant.

COUNSEL

William R. Higham, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Stan M. Helfman and Enid A. Camps, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

CHIN, J.—

## I. INTRODUCTION

Jeffrey Allen Wallace appeals from a judgment of conviction for multiple sex offenses. The primary issues are (1) whether the court should have excluded deoxyribonucleic acid (DNA) analysis evidence, and (2) whether the court should have instructed the jury that an element of the five-year

enhancement for infliction of great bodily injury in the commission of certain sex offenses (Pen. Code, § 12022.8)[1] is the specific intent to inflict such injury.

Pursuant to our opinion in *People* v. *Barney* (1992) 8 Cal.App.4th 798 [10 Cal.Rptr.2d 731], we conclude the trial court erred in admitting the DNA evidence, but we find the error was harmless in light of other overwhelming evidence of Wallace's guilt. We also hold there was no instructional error because specific intent to inflict great bodily injury is not an element of the five-year enhancement.

## II. FACTS AND PROCEDURE

Wallace committed a series of violent sexual assaults upon seven women on four separate dates in 1988 and 1989. In each incident he used plastic "flex-tie" cuffs to bind his victims and then committed multiple acts of rape, forcible oral copulation, or rape with a foreign object. The incidents shared several distinctive similarities.

### A. *July 30, 1988*

Wallace confronted Lynn and Jill as they were walking in a park. He displayed a gun, bound their hands behind their backs with flex-ties, and forced them at gunpoint to walk to another location, where he flex-tied Lynn's legs and then brutally assaulted Jill as Lynn lay next to them. He covered Jill's head so that she could not see, used a knife to cut off her underpants and brassiere, forced his fist into her vagina, raped her, and forced the barrel of his gun into her anus.

### B. *August 11, 1988*

Wallace burglarized the home of JoAnne, with whom her niece MaryBeth and MaryBeth's roommate Ann were staying. He displayed a gun and used flex-ties to bind their hands behind their backs. He also flex-tied their ankles and put pillowcases over their heads. He ripped off Ann's pants and underwear, penetrated her vagina with his finger, ran his fingernail from her breasts to her pubic hair, and raped her. He then attacked JoAnne. He cut off her underpants and brassiere with a knife, used the knife point to trace an S-shape from her chest to her pubic area, used surgical gloves and a lubricant to penetrate her vagina with his fingers, forced her at knifepoint to orally copulate Ann, and forced an object into JoAnne's anus.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

### C. *December 19, 1988*

Wallace burglarized the home of Audrey, put a gun to her forehead, flex-tied her wrists behind her back, and put a pillowcase over her head. He punched her in the sternum and left eye, used a knife to draw on her stomach, cut open her clothing, bit her breasts and neck, orally copulated her, used hand cream to penetrate her vagina with his fingers, and raped her. Afterward, he flex-tied her ankles, bound her hands and feet together, and hit her several times with his gun.

### D. *March 15, 1989*

Wallace burglarized the home of 15-year-old Jenny, displayed a knife, and sprayed a substance into her face. The substance smelled like insecticide and burned Jenny's eyes so that she could not open them. Wallace bound her arms behind her back with a flex-tie, gagged her, covered her head with a pillowcase, bound her feet with duct tape, carried her to a vehicle, and covered her with a quilt from her brother's bed. He then drove her to another location, where he laid her on the quilt, removed her pants and underpants, cut her sweater up the front with a knife and removed her brassiere, orally copulated her, forced her to orally copulate him, raped her, and then sprayed her vagina and anus with the insecticide-like substance, using his fingers to put the substance inside her vagina.

### E. *The Arrest*

Wallace was arrested on April 5, 1989, after a woman saw him prowling and summoned the police. Officers searched the densely foliated area where he was initially detained and discovered eight flex-ties, camouflage clothing, a shotgun and ammunition, a knife, pink tissues, duct tape, and a cellophane bag containing a Vaseline-type substance. Wallace's fingerprints were on one of the flex-ties and one of the pink tissues.

### F. *The Confession*

On the day of the arrest, a police officer informed Wallace he would be booked for prowling, burglary, rape, and kidnapping. Two days later, Wallace's fiancée visited him in jail, having learned of the charges. She asked him something like, "[D]id [you] do these things?" or "Did you do it?" or "Are you guilty?" He replied, "yes."

### G. *The Serological and DNA Evidence*

Serological analysis indicated that Wallace's blood sample and semen obtained from Jill's sweatshirt and a quilt from Audrey's bed shared a blood type found in only 2 to 3 percent of the Caucasian population.

Evidence of DNA analysis by the Federal Bureau of Investigation (FBI) was admitted after a *Kelly-Frye* hearing. (*People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013 [54 App.D.C. 46, 34 A.L.R. 145].) The testimony was somewhat equivocal.

FBI Special Agent Lawrence Presley said Wallace's blood sample and semen from the sweatshirt, the quilt, and Jenny's underwear shared the same DNA pattern, but because the pattern for the blood sample had some extra bands (see *People* v. *Barney*, *supra*, 8 Cal.App.4th at p. 813), and because he took a "very conservative" approach, he could not conclusively declare a match or no match. He did say, however, that Wallace could not be excluded as the source of the semen.

In contrast, Professor George Sensabaugh testified that in his opinion the DNA patterns for the blood sample and the semen were indistinguishable. He calculated the statistical frequency with which this DNA pattern appears in the Caucasian population as "about 1 in 26 million." However, he reported the frequency as "in excess of one in a million," because he believed greater numbers were "superfluous" and "once we go beyond one in a million, we don't really have a good sense of what the numbers mean."

### H. *Conviction and Sentencing*

A jury convicted Wallace of 46 felony offenses and 2 misdemeanor offenses. These included rape (§ 261, subd. (2)); forcible penetration by foreign object (§ 289, subd. (a)); forcible oral copulation (§ 288a, subd. (c)); kidnapping (§ 207, subd. (a)); assault with a deadly weapon (§ 245, subd. (a)); first degree burglary (§ 459); first degree robbery (§ 211); false imprisonment (§ 236); and prowling (§ 647, subd. (g)).

The jury also sustained multiple enhancement allegations, including use of a weapon (§§ 12022.3, 12022.5) and great bodily injury (§§ 12022.7, 12022.8).

The court imposed consecutive sentences and enhancements for which it calculated a total prison term of 303 years. The Department of Corrections subsequently recomputed the imposed sentences and enhancements as adding up to 283 years and 8 months.

### III. THE DNA EVIDENCE

### A. *The Error*

Wallace challenges the admission of the DNA analysis evidence on the ground the FBI's method of analysis does not meet the *Kelly-Frye*

standard of general acceptance in the relevant scientific community. (*People v. Kelly, supra*, 17 Cal.3d at p. 30; *Frye v. United States, supra*, 293 Fed. at p. 1014.)

In *People v. Barney, supra*, 8 Cal.App.4th 798, we held that DNA analysis evidence of the sort produced in the present case was inadmissible. We concluded the *Kelly-Frye* standard was met for the processing and matching steps of DNA analysis, but was not met for the statistical analysis step because of an absence of general scientific acceptance as to the process used to calculate the statistical significance of a match of DNA patterns. (*Barney, supra*, at pp. 811-814, 818-821.) However, we observed that "a match of DNA patterns is a matter of substantial significance" (*id.*, at p. 821), and anticipated that new methods of statistical calculation proposed by the National Research Council will likely receive general acceptance resulting in future admissibility of DNA analysis evidence (*id.*, at p. 822).

Our finding of no general acceptance in *Barney* was based on our review of relevant scientific literature. Some of the publications had been admitted in evidence below, but we relied primarily on two postjudgment sources: a group of articles in a scientific journal, and a report on DNA analysis by the National Research Council (NRC). (*People v. Barney, supra*, 8 Cal.App.4th at pp. 818-821; see Lewontin & Hartl, *Population Genetics in Forensic DNA Typing* (Dec. 20, 1991) Science, at p. 1745; Chakraborty & Kidd, *The Utility of DNA Typing in Forensic Work* (Dec. 20, 1991) Science, at p. 1735; Roberts, *Fight Erupts Over DNA Fingerprinting* (Dec. 20, 1991) Science, at p. 1721; NRC, DNA Technology in Forensic Science (1992).) The People contend it was error in *Barney*, and would likewise be error here, to decide the question of general acceptance based on a review of scientific literature that was not presented at the trial level.

There is nothing new in our approach. The key case is *People v. Shirley* (1982) 31 Cal.3d 18 [181 Cal.Rptr. 243, 723 P.2d 1354], where the Supreme Court conducted an independent review of scientific treatises and articles in scholarly journals and held that *Kelly-Frye* precluded admission of testimony by a witness who had undergone hypnosis for the purpose of restoring memory. The court explained that "scientists have long been permitted to speak to the courts through their published writings in scholarly treatises and journals. [Citations.] The courts view such writings as 'evidence,' not of the actual reliability of the new scientific technique, but of its acceptance *vel non* in the scientific community." (*Shirley, supra*, at p. 56.)

In a later decision, the Supreme Court reiterated that the reviewing court need not absorb all the relevant literature or decide reliability, but "need only

conduct a 'fair overview' of the subject, sufficient to disclose whether 'scientists significant either in number or expertise publicly oppose [a technique] as unreliable.' " (*People* v. *Brown* (1985) 40 Cal.3d 512, 533 [220 Cal.Rptr. 637, 709 P.2d 440], quoting *People* v. *Shirley, supra,* 31 Cal.3d at p. 56.) However, the court also cautioned that the *Shirley* approach may be inappropriate in some cases. "Often . . . the technical complexity of the subject matter will prevent lay judges from determining the existence, degree, or nature of a scientific consensus or dispute without the interpretive assistance of qualified live witnesses subject to a focused examination in the courtroom." (*Brown, supra,* at p. 533.)[2]

In *People* v. *Pizarro* (1992) 10 Cal.App.4th 57 [12 Cal.Rptr.2d 436]—a DNA case that appeared shortly after *Barney* —the court relied on the *Brown* caveat and remanded the case to the trial level for a further hearing to determine the issue of general acceptance of the statistical calculation process, concluding, "we do not think it is generally appropriate that a finding of fact that there is not general acceptance should be made outside the trial record in cases of this complexity." (*Pizarro, supra,* at p. 89.) Under the present circumstances, we disagree. The subject of DNA analysis is technically complex, but this complexity does not interfere with our perception of the obvious. A leading scientific journal has aired a "bitter" and "raging" debate among population geneticists concerning the reliability of the process used to calculate the statistical significance of a match of DNA patterns. (*People* v. *Barney, supra,* 8 Cal.App.4th at p. 818.) In the NRC report, a panel of experts drawn from a broad spectrum of the relevant scientific community has agreed there is a "substantial controversy" on this point. (*Id.,* at p. 819.) Any lay observer capable of comprehending the technique of DNA analysis is capable of perceiving the lack of general acceptance.

In accordance with our opinion in *Barney,* we hold that Professor Sensabaugh's testimony should have been excluded for want of general acceptance of the method of statistical calculation employed to produce the frequency estimate of about one in twenty-six million. The error is mitigated by the witness's stated preference for the more conservative estimate of "in excess of one in a million," but even that lesser estimate cannot be sanctioned, since it too is unsupported by a showing of general acceptance of the underlying statistical basis for it. The admission of this DNA evidence was error under *Kelly-Frye.*

Only eight months have passed since our decision in *Barney,* not enough time to confirm our speculation that the new methods of statistical calculation proposed by the NRC report will likely receive general acceptance

---

[2]At the trial level, the judge has the advantage of being able not only to review the scientific literature, but also to turn to the expert witnesses for explanation of the literature.

resulting in future admissibility of DNA analysis evidence. (*People* v. *Barney, supra,* 8 Cal.App.4th at p. 822.) However, recent developments have shown that general acceptance may not be easily achieved. It appears that some proponents of DNA analysis, rather than attempting to come to terms with the NRC report or some other compromise on statistical calculation, have taken the offensive and attacked the report's proposed new methods of statistical calculation as unsound. (See Devlin et al., *Statistical Evaluation of DNA Fingerprinting: A Critique of the NRC's Report* (Feb. 5, 1993) Science, at p. 748; Aldhous, *Geneticists Attack NRC Report As Scientifically Flawed* (Feb. 5, 1993) Science, at p. 755.)

The People claim the position of these proponents is the majority view and is substantively correct, calling for reconsideration of *Barney*. In doing so, the People persist in miscomprehending the issue before us. As we said in *Barney,* "the point is not whether there are more supporters than detractors, or whether (as the Attorney General and amicus curiae claim) the supporters are right and the detractors are wrong. The point is that there is disagreement between two groups, each significant in both number and expertise . . . ." (*People* v. *Barney, supra,* 8 Cal.App.4th at p. 819.) Our inquiry must end with the perception of such disagreement and consequent lack of general acceptance.

While we are in no position to choose sides in this ongoing dispute, we note that its persistence threatens the admissibility of an extremely important forensic tool. This is no time for purist insistence that DNA evidence should be admitted on one's own terms or not at all. As Dr. Sensabaugh clearly grasped, it matters little to a jury whether the odds are one in one million or one in 26 million. Either estimate is devastating to the defendant. Our hope is that the key players in this dispute will take their cue from Dr. Sensabaugh and agree to a compromise on statistical calculation. Otherwise, they risk preventing any general acceptance at all, thus precluding the admissibility of DNA analysis evidence.[3]

---

[3]The Attorney General also takes issue with our comment in *Barney* that DNA analysis evidence "means nothing without a determination of the statistical significance of a match of DNA patterns." (*People* v. *Barney, supra,* 8 Cal.App.4th at p. 817.) We can only respond by quoting the experts in the NRC report: "To say that two patterns match, without providing any scientifically valid estimate (or, at least, an upper bound) of frequency with which such matches occur by chance, is meaningless." (NRC, DNA Technology in Forensic Science, *supra,* at p. 74; see also *People* v. *Axell* (1991) 235 Cal.App.3d 836, 866 [1 Cal.Rptr.2d 411] ["a match between two DNA samples means little without data on probability"].) Perhaps it is more accurate to state, as we also did in *Barney,* that evidence of a match "is *incomplete* without an interpretation of its significance." (*People* v. *Barney, supra,* 8 Cal.App.4th at p. 822, italics added.)

## B. *The Absence of Prejudice*

The question remains whether the error was prejudicial or harmless. In *Barney* we concluded that, in the two companion cases decided by our opinion, it was not reasonably probable a different result would have been reached absent the admission of the DNA evidence. (*People v. Barney, supra,* 8 Cal.App.4th at pp. 825-826; see *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) We come to the same conclusion in the present case. Even excluding the DNA analysis, Wallace's guilt was overwhelmingly demonstrated by victim identification testimony, circumstantial evidence, serological evidence, and Wallace's own confession.

A fundamental element of our analysis is the undeniable fact that the same person perpetrated all these offenses. The incidents shared very distinctive similarities, including the use of flex-ties, the cutting of clothing with a knife, the covering of the victims' heads, digital penetration with use of a lubricant, and the tracing of shapes on the victims' torsos. The issue in this case was the identity of the perpetrator.

Most of the victims were unable to identify Wallace; their heads had been covered. However, both Lynn and Jenny saw the perpetrator's face and identified Wallace at trial. Jenny said she felt "certain, but I'm not positive because I never saw his mouth features." Lynn's identification, however, was unequivocal. Because it was clear the same person perpetrated all the offenses, a victim identification for just one of the offenses meant a tie to all of them.

The circumstantial evidence was powerful. When Wallace was arrested, the police found many incriminating items, including flex-ties, a shotgun, a knife, duct tape, and lubricant. Wallace was connected to these items by fingerprint evidence. Additionally, the soles of a pair of shoes seized from Wallace's residence were consistent with shoe prints found at the scene of the assault on Lynn and Jill, and near the scene a witness saw a parked pickup truck which was similar to a truck owned by Wallace. The pattern of tires on Wallace's pickup truck matched a tire impression found on the floor of Jenny's garage.

The serological evidence substantially contributed to the prosecutor's case. The numbers were not as high as for the DNA evidence, but it was certainly a matter of significance that Wallace's blood sample and the semen obtained from Jill's sweatshirt and the quilt from Audrey's bed shared a blood type found in only 2 to 3 percent of the Caucasian population.

If all this were somehow not quite enough to demonstrate Wallace's guilt, any doubt would be dispelled by the confession to his fiancée after his

incarceration. She did not question Wallace as to any specific incident, but they both knew he was accused of not just the prowling incident but also burglary, rape, and kidnapping. Given the fact a single person perpetrated all the offenses, his admission of guilt, even though nonspecific, amounted to a confession to all the crimes.

In contrast, the DNA analysis was not a crucial element of the prosecutor's case. The impact of the DNA evidence was lessened in two respects. First, Special Agent Presley would not declare a match of the DNA patterns. Second, Professor Sensabaugh substantially reduced the statistical frequency estimate from "about 1 in 26 million" to "in excess of one in a million." Our exclusion of DNA evidence in *Barney* resulted from claims within the relevant scientific community that the frequency estimates produced by current statistical calculation methods are substantially inflated. (*People* v. *Barney, supra*, 8 Cal.App.4th at pp. 818-819.) Sensabaugh's reduction of the frequency estimate mitigated the purported inflationary effect.

The prosecutor did not assert the DNA evidence as conclusive proof that Wallace was the perpetrator. In his opening statement he said the significance of the DNA analysis was that Wallace "cannot be excluded," and the analysis was "[j]ust another piece of evidence in this case." In his closing argument he said the DNA evidence "corroborates" the victim identifications, and although he repeated Sensabaugh's statistical frequency estimates he again emphasized the character of the DNA evidence as indicating "[t]he defendant can't be excluded."

Even the trial judge observed at sentencing that the DNA evidence had not been crucial: "When I heard the evidence at the same time the jurors did, [it] became pretty clear to me that there was a lot more to this case than just DNA evidence. One of the jurors was quoted in the paper as saying that the evidence in this case was overwhelming, and I would agree with that assessment."

In short, even without the DNA analysis the case against Wallace was compelling. There was overwhelming evidence of guilt, consisting of victim identifications, circumstantial evidence, serological evidence, and a confession. The DNA evidence was equivocal and was not crucial to the prosecutor's case. It is not reasonably probable a different result would have been reached absent the admission of the DNA evidence. (*People* v. *Watson, supra*, 46 Cal.2d at p. 836.) Indeed, even under the more stringent standard for federal constitutional error (which this was not), the error was harmless

beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].)[4]

## IV. GREAT BODILY INJURY

### A. *The Jury Instruction*

■ Wallace contends the court erred in instructing the jury on the five-year enhancement prescribed by section 12022.8 for infliction of great bodily injury in the commission of certain sex offenses. He argues the instruction should have included, as an element of the enhancement, the specific intent to inflict great bodily injury.

The court in *People* v. *Brown* (1985) 174 Cal.App.3d 762, 766 [220 Cal.Rptr. 264], in effect held otherwise: "[S]ection 12022.8 does not require a finding that the perpetrator of the crime *intentionally* inflicted great bodily injury on the victim." (Original italics; accord *People* v. *Phillips* (1989) 208 Cal.App.3d 1120, 1123-1124 [256 Cal.Rptr. 654].) This conclusion flows from a comparison of section 12022.8 with section 12022.7, which imposes a three-year enhancement for infliction of great bodily injury in the commission of nonsex felonies. Section 12022.7 imposes the three-year enhancement on "[a]ny person who, *with the intent to inflict such injury*, personally inflicts great bodily injury . . . ." (Italics added.) Great bodily injury is defined as "a significant or substantial physical injury." (§ 12022.7.) In contrast, section 12022.8 imposes the five-year enhancement on "[a]ny person who inflicts great bodily injury, as defined in Section 12022.7 . . . ." In section 12022.8 there is no element of *intent* to inflict great bodily injury. The court in *Brown* concluded the Legislature was aware of the differences in the statutory texts and intended to omit a requirement of specific intent from section 12022.8. (*Brown, supra*, at pp. 766-767.)

The waters have been somewhat muddied, however, by *People* v. *Santos* (1990) 222 Cal.App.3d 723 [271 Cal.Rptr. 811]. The issue in that case was whether specific intent is an element of the enhancements prescribed by section 667.7 for habitual offenders who "inflicted great bodily injury as provided in Section 12022.7, or personally used force which was likely to produce great bodily injury . . . ." (§ 667.7, subd. (a).) The trial judge in *Santos* did not give a specific intent instruction for the habitual offender

---

[4]Because we conclude the admission of the DNA evidence was error under *Kelly-Frye* but harmless under either the *Watson* or *Chapman* standards, we need not address Wallace's additional claims that the court denied his constitutional right of confrontation by taking judicial notice of transcripts and findings from *Kelly-Frye* hearings in two unrelated cases, or that the court should have excluded Professor Sensabaugh's statistical frequency testimony as being unduly prejudicial under Evidence Code section 352.

enhancement, but did so for a five-year enhancement alleged under section 12022.8, which the jury found not to be true. (*Santos*, *supra*, at pp. 729, 742.) The appellate court held, among other things, that because section 12022.7 requires specific intent to inflict great bodily injury, and section 12022.7 is incorporated by section 667.7, the latter requires the same specific intent. (*Santos*, *supra*, at p. 744.) The court did *not* rule on the propriety of the specific intent instruction for the five-year enhancement under section 12022.8.

Nevertheless, a 1990 revision to CALJIC No. 17.20.1 includes the bracketed phrase, "with the specific intent to inflict such injury," as an element of the section 12022.8 enhancement. The use note and comment accompanying the revised instruction, stating the revision was prompted by *Santos*, explains that specific intent "may" be required "by parity of reasoning" from section 667.7, and that the *Santos* trial judge's specific intent instruction for section 12022.8 "was not specifically reviewed on appeal, but it appears to have been tacitly approved by the Court of Appeal." (Use Note to CALJIC No. 17.20.1 (1990 rev.) (5th ed. 1992 pocket pt.) p. 121.)

We believe the CALJIC commentary has, out of an evident abundance of caution, read too much into *Santos*, particularly in light of a crucial distinction between sections 667.7 and 12022.8.

*Santos* did not tacitly approve the trial judge's specific intent instruction for section 12022.8. The court did not even address the point except to mention the instruction as contrasting with the lack of such instruction for section 667.7. (*People* v. *Santos*, *supra*, 222 Cal.App.3d at p. 742.) The propriety of the instruction on section 12022.8 was simply not an issue on appeal, and indeed could not have been, since the jury found the five-year enhancement allegation to be untrue.

There is no parity of reasoning between sections 667.7 and 12022.8. The language of the references to section 12022.7 in the two statutes is different. Section 667.7, subdivision (a), broadly refers to infliction of great bodily injury "as provided" in section 12022.7. This logically leads to the conclusion in *Santos* that section 667.7 requires specific intent to inflict great bodily injury, since that requirement is "provided" in section 12022.7. (*People* v. *Santos*, *supra*, 222 Cal.App.3d at p. 744.) In contrast, section 12022.8 more narrowly refers to infliction of great bodily injury "as defined" in section 12022.7. The reference in section 12022.8 to section 12022.7 does not incorporate the latter's specific intent provision, as is the case with section 667.7, but merely incorporates the definition of great bodily injury. The statutory references are not comparable.

In short, the proposition that specific intent to inflict great bodily injury is an element of section 12022.8 does not withstand scrutiny of the opinion in *Santos* and the pertinent sections of the Penal Code. The law remains as stated in *Brown*: "[S]ection 12022.8 does not require a finding that the perpetrator of the crime *intentionally* inflicted great bodily injury on the victim." (*People* v. *Brown, supra,* 174 Cal.App.3d at p. 766, original italics.)

## B. *Sufficiency of the Evidence*

■ Wallace also contends the evidence was insufficient to support imposition of the great bodily injury enhancements for the offenses against Lynn and Jenny. Lynn sustained cuts on her wrists and ankles from being flex-tied. One finger of her right hand had no feeling in it for two months. Jenny's wrists were burned from the flex-ties and were bandaged for two days. She testified the insecticide-like substance caused "really, really bad" burning in her eyes, vagina, and anus for 24 hours. Wallace argues that as a matter of law these injuries did not amount to great bodily injury.

The law on this point was clarified by *People* v. *Escobar* (1992) 3 Cal.4th 740 [12 Cal.Rptr.2d 586, 837 P.2d 1100], which disapproved the test for great bodily injury set forth in *People* v. *Caudillo* (1978) 21 Cal.3d 562 [146 Cal.Rptr. 859, 580 P.2d 274]. The opinion in *Caudillo* created a requirement that the victim suffer permanent or protracted disfigurement, impairment, or loss of bodily function. (*Caudillo, supra,* at pp. 588-589.) The Supreme Court discarded this requirement in *Escobar,* concluding that these elements are not required by the definition of great bodily injury set forth in section 12022.7 ("significant or substantial physical injury"). (*Escobar, supra,* at p. 750.) Thus, in *Escobar,* there was great bodily injury where a rape victim suffered extensive bruises and abrasions to her legs, knees, and elbows, a stiff neck, and soreness in the vaginal area of such severity that it temporarily impaired her ability to walk. Such injuries, the court concluded, are not of a sort routinely associated with rape, "but reflect a degree of brutality and violence substantially beyond that necessarily present in the offense." (*Ibid.*)

Lynn sustained great bodily injury even under the more stringent requirements of the former *Caudillo* standard. The lack of feeling in her finger for two months amounted to a prolonged or protracted impairment or loss of bodily function. (See *People* v. *Muniz* (1989) 213 Cal.App.3d 1508, 1520 [262 Cal.Rptr. 743] [bruises were more than merely transitory under *Caudillo* because they lasted four months].)

Jenny's injury was not protracted, but it nevertheless qualified as great bodily injury under *Escobar.* Wallace's use of the insecticide-like spray was

anything but routine. Not content simply to spray Jenny's face, vagina, and anus, he applied the substance to the inside of her vagina by spraying it on his fingers and then penetrating her, causing severe burning pain for 24 hours. As in *Escobar*, this is not a type of injury routinely associated with sexual assault, but reflects "a degree of brutality and violence substantially beyond that necessarily present in the offense." (*People* v. *Escobar, supra,* 3 Cal.4th at p. 750.)

The evidence was sufficient to support the great bodily injury enhancements for the offenses against both Lynn and Jenny.

## V.   CRUEL OR UNUSUAL PUNISHMENT

■   Finally, Wallace contends his prison sentence of 283 years and 8 months is cruel or unusual under article I, section 17, of the California Constitution. He argues a sentence of such great length is "bizarre in the extreme" and thus is unusual in the literal sense (*People* v. *Schueren* (1973) 10 Cal.3d 553, 560 [111 Cal.Rptr. 129, 516 P.2d 833]), is so disproportionate to the offenses as to shock the conscience and offend fundamental notions of human dignity (*In re Lynch* (1972) 8 Cal.3d 410, 424 [105 Cal.Rptr. 217, 503 P.2d 921]), and was an abuse of discretion.

It was Wallace's conduct, not his sentence, that was cruel and unusual. The brutality and depravity displayed by Wallace was so extreme as to evoke the following comment in the probation department's presentencing report: "The crimes for which the defendant has been convicted in these cases are so egregious, violent, degrading, defiling and dehumanizing that these victims cannot and must not fade into abstraction, no matter what transpires next or how long it takes. The horror and pain that they suffered at the whim of Jeffrey Wallace is both real and incomprehensible. Were he ever to be released to prey on anyone in this horrendous manner again, it would make mockery of their pain and the justice that is rightfully theirs." The trial judge was of like mind, commenting at the sentencing hearing that "a cold transcript in black and white . . . will never show the fear and pain on the victims' faces and the anguish in their voices when they testified in this case . . . ." The judge said his objective was to impose what was in effect "a sentence for life" so that Wallace "will never again be able to prey upon women in our society."

Viewed in this context, rather than in the abstract, the length of the sentence was not "bizarre," but had a rational basis—to ensure that Wallace would be imprisoned for life and would never be released on parole. Nor, given the nature and number of the offenses and the number of victims, was

the sentence disproportionate or an abuse of discretion. In *People* v. *Bestelmeyer* (1985) 166 Cal.App.3d 520, 532 [212 Cal.Rptr. 605], the court held that consecutive prison terms totaling 129 years for the commission of 25 offenses against a single victim were not cruel or unusual. Wallace committed 46 felonies, with enhancements, against 7 victims. His sentence was proportionate to that approved in *Bestelmeyer*.

## VI. DISPOSITION

The judgment is affirmed.

Merrill, Acting P. J., and Werdegar, J., concurred.

A petition for a rehearing was denied April 23, 1993, and the petitions of both respondent and appellant for review by the Supreme Court were denied June 24, 1993. Mosk, J., and Panelli, J., were of the opinion that the petitions should be granted.