[No. A064328. First Dist., Div. Four. Mar. 21, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID WILLIAM TAYLOR, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.

## COUNSEL

Barry J. Post and Lisa J. Kanovsky for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ann K. Jensen and Joanne S. Abelson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**POCHÉ, Acting P. J.**—Defendant, David William Taylor, appeals from a judgment of conviction entered on jury verdicts finding him guilty of three counts of rape (Pen. Code,[1] § 261, subd. (a)(2)), one count of oral copulation (§ 288a, subd. (c)), two counts of attempted oral copulation (§§ 288a, subd. (c), 664), two counts of kidnapping and one count of kidnapping of a victim under the age of fourteen (§§ 207, subd. (a), 208, subd. (b)), with enhancements on all counts for personal use of a knife (§§ 12022, subd. (b), 12022.3), and enhancements for kidnapping with intent to commit the rape and oral copulation counts (§ 667.8, subd. (a)), and upon a finding of true made by the court that he had served a prior prison term (§ 667.5).

On appeal defendant raises two primary claims of error. First, he argues that the trial court erroneously denied his motion for new trial made on the basis that the court should not have admitted deoxyribonucleic acid (DNA) evidence. Specifically he contends the trial court erred in finding the modified ceiling approach for calculating statistical frequencies of a DNA match

---

[1] Unless otherwise noted all subsequent statutory references are to the Penal Code.

met the legal standard for reliability of scientific evidence set out in *People v. Kelly* (1976) 17 Cal.3d 24, 30 [130 Cal.Rptr. 144, 549 P.2d 1240]. Second, he contends it was error to deny his motion for mistrial made on the basis that various references during trial to defendant's having been previously arrested or convicted so prejudiced the jury as to deny defendant a fair trial.

Because the facts of this case are almost entirely unrelated to the issues presented on appeal suffice it to say that defendant was charged with the various offenses committed against a 15-year-old girl and her 13-year-old boyfriend whom he came upon late one evening in a park. These charges were originally part of a 32-count information filed which involved 5 minor victims. Defendant pled no contest to some counts, others were severed. The proceeding on appeal was a retrial of the first 13 counts after the jury in a prior trial was unable to reach a verdict.

*Discussion*

## I. *DNA*

Determining whether or not to grant a motion for new trial lies in the discretion of the trial court and will not be reversed on appeal absent a finding of manifest and unmistakable abuse of that discretion. (*People v. Williams* (1988) 45 Cal.3d 1268, 1318 [248 Cal.Rptr. 834, 756 P.2d 221].)

In order to introduce evidence of a new scientific technique the proponent of the evidence must make a three-part showing: (1) the technique or method is sufficiently established to have gained general acceptance in the appropriate scientific community; (2) testimony about the technique and its application is offered by a qualified expert; (3) correct scientific procedures were followed in administration of the technique or method in the particular case. (*People v. Morris* (1991) 53 Cal.3d 152, 206 [279 Cal.Rptr. 720, 807 P.2d 949]; *People v. Kelly, supra,* 17 Cal.3d at p. 30.)

Our Supreme Court has recently reaffirmed the validity of the standard for determining the admissibility of new scientific techniques which it set out in *People v. Kelly, supra,* 17 Cal.3d at page 30. (*People v. Leahy* (1994) 8 Cal.4th 587, 604 [34 Cal.Rptr.2d 663, 882 P.2d 321].) Not only did the court reaffirm *Kelly,* but it sought to explain the *Kelly* standard in light of two of its subsequent opinions. It noted that general acceptance in the scientific community requires the trial court to consider both "the quality, as well as quantity, of the evidence supporting or opposing a new scientific technique," rather than to simply count noses of those who may possess some credentials to have an opinion of the technique. (*People v. Leahy, supra,* 8 Cal.4th at p. at p. 612.)

 The admissibility of DNA analysis evidence has been the subject of considerable judicial ink. While the cases are scarcely unanimous certain principles are undisputed. *Kelly*'s test of general acceptance in the scientific community applies not only to the techniques for laboratory analysis of the DNA material but also to the statistical calculations which indicate the likelihood that the crime scene sample of DNA would match with some individual other than the defendant. (*People* v. *Barney* (1992) 8 Cal.App.4th 798, 818 [10 Cal.Rptr.2d 731].)

At the time of the *Kelly* hearing conducted in this case in February 1993 there was authority for the proposition that the laboratory processes and protocols used in DNA analysis by Cellmark Diagnostic—the testing company which performed the test conducted in this case—met with general scientific acceptance. (*People* v. *Axell* (1991) 235 Cal.App.3d 836, 862 [1 Cal.Rptr.2d 411].) However, in August of 1992, another division of this court had concluded that the statistical calculation step of a DNA analysis was the subject of such scholarly dispute that it could not be said that the statistical calculation method then employed had achieved general scientific acceptance. (*People* v. *Barney, supra,* 8 Cal.App.4th at pp. 820-821.) Thus, at the time this *Kelly* hearing was held, in early February 1993, the focus of that hearing was upon whether the statistical calculation methods which had been used met with general acceptance in the scientific community.[2]

### DNA Testing

In fact, there have been several different methods used at various times and by various laboratories for calculating the statistical likelihood of a random match between the DNA pattern of the defendant and the pattern obtained from the crime scene sample. To further complicate the matter each laboratory which does DNA analysis makes its comparisons against different data bases.

It was against this background that in late 1991 a controversy surfaced over the validity of the statistical calculations which were being made. Some scientists adopted the position articulated in print by Drs. Lewontin and Hartl that the existence of ethnic subgroups—and consequent genetic similarities within that subgroup—might be very different from such genetic similarities in a data base composed more generally of a single racial category. For example, shared DNA patterns in individuals of Polish extraction might be much more common than shared patterns found in a data base consisting of samples taken from individuals grouped only as Caucasian.

---

[2]On appeal defendant challenges only that portion of the *Kelly* ruling of the trial court dealing with acceptance in the scientific community of the statistical calculation. However, the trial court specifically made the finding that the prosecution had met all three prongs of *Kelly*.

In response to this criticism and others the National Research Counsel (NRC) studied the matter and issued a recommendation in April 1992 which called for collection of data from more subgroups, and proposed that until such data could be assembled an interim method for calculating statistical frequencies should be adopted which would assume the existence of population subgroups and allow for that possibility by assuming a minimum frequency of DNA patterns unless the actual data gave a higher frequency figure. This method, called the "modified ceiling approach," is considered to be conservative in that it presumably overstates the actual frequency of DNA pattern matches in the general population, and therefore benefits the defendant by suggesting that matches made with defendant's DNA are more common than the actual data would suggest.

### *Kelly Hearing*

Four experts testified at the *Kelly* hearing. The first was Dr. Charlotte Word, who works for Cellmark Diagnostic. According to Dr. Word, Cellmark's calculation in this case had been done using the modified ceiling approach recommended by the NRC, but in fact Cellmark used an even more conservative calculation with a confidence interval of 99.7 percent while the method advocated by the NRC has a confidence interval of only 95 percent. The NRC had also suggested that two figures be given—first, the likelihood of a DNA match between the defendant and the crime scene sample based upon the modified ceiling approach, and, second, any actual match between defendant's DNA and any similar pattern in the sample data base (the counting method). Dr. Word provided both numbers as calculated by Cellmark. Dr. Word testified that she was unaware of any expert who rejected the modified ceiling approach calculation as unreliable, though there were experts who objected to it as too conservative—that is, more favorable to the defendant than the actual data would warrant. In her view the controversy had now shifted from whether the likelihood of a match was a reliable number to whether the modified ceiling approach, while reliable, was too favorable to defendants.

Dr. William Shields testified that as of late 1991 he had shared the reservations of those who questioned a calculation done without regard to the possible effects of subpopulations. In his opinion the modified ceiling approach met his objections and those of one of the two authors who first raised the subpopulation issue in a scientific paper. In his view a majority of those in the scientific community who had objected to the calculation method (single product rule) being used in 1991 were satisfied with the reliability of the modified ceiling calculations if they were done properly. He, like Dr. Word, noted the objections of some scientists to the conservatism of the results obtained with the modified ceiling approach: "most of the

scientists I know involved in this field all agree that [the modified ceiling approach] produces a conservative estimate of the frequency that is used in this kind of forensic DNA testing." Nonetheless, he testified that the results of the method were reliable and that that opinion was shared by the majority of scientists in the field.

Dr. George Sensabaugh, who had been a member of the committee which issued the NRC report, testified that he was one of those scientists who believed that the modified ceiling approach was too conservative because "it does not accurately represent the true frequencies."

Finally, defense expert Dr. Lawrence Dochez Mueller testified that in his opinion the modified ceiling approach if done correctly would provide "reliable statistical estimates." Dr. Mueller, however, testified that there was not "a clear majority" of scientists in the field who supported the use of the modified ceiling approach. He noted in particular reservations held by some scientists about the conservativeness of the frequencies obtained with that method of doing the calculation. Under questioning from the court Dr. Mueller stated that of those who had had concerns about the earlier method of calculating statistical frequencies, many experts, including himself, were content with the NRC's recommendation of the modified ceiling approach coupled with the counting method, but that there remained a minority of experts who were not, and that among them were "some of the very best confident [sic] people in the field of population genetics and statistics" whose opinions on the issue he respected.

### Ruling

Noting that this case addressed precisely the question left open in *People v. Barney, supra,* 8 Cal.App.4th 798, namely whether or not the modified ceiling approach recommended by the NRC had gained general acceptance in the scientific community, the trial court concluded that it had. "[T]he issue is not whether the modified ceiling approach has gained general acceptance among the Lewontin-Hartl group, but whether it has gained general acceptance in the entire DNA scientific community. The Barney and Howard case found that those critics of the original Cellmark approach were significant in both numbers and expertise. I do not make that finding in respect to those scientists who presently oppose the NRC interim approach."

Defendant takes issue with one portion of the ruling in particular: "Those critics of the modified ceiling approach, who believe that the results are too conservative, would at least agree that the assigned probability resulting from the modified ceiling approach is greater than the true probability."

Defendant contends that many of the scientists who opposed the approach did so because they felt it to be unsound, and cites to this court a number of scientific publications which he contends support that position.

Our review on appeal of selected publications is a poor substitute for the testimony of several experts subject to cross-examination and judicial questioning as to the degree of general acceptance. This trial judge conducted a very thorough hearing, injecting his own questions to the experts on many occasions. The portion of the ruling to which defendant objects may not represent defendant's view of the matter or that of his expert, but it very closely tracks opinions expressed by Drs. Shields and Word. There is, in short, evidence to support the finding.

In any event, defendant objects to the notion that general acceptance in the field can be measured by weighing a majority against a minority. He maintains the trial court misapplied the *Kelly* test. " 'General acceptance' under *Kelly* means a consensus drawn from a typical cross-section of the relevant, qualified scientific community." (*People* v. *Leahy, supra,* 8 Cal.4th at p. 612.) In *Leahy* the Supreme Court specifically cited with approval the following language from its earlier opinion in *People* v. *Guerra* (1984) 37 Cal.3d 385, 418 [208 Cal.Rptr. 162, 690 P.2d 635]: "[T]he test is met if use of the technique is supported *by a clear majority* of the members of that community." (Italics added in *Leahy; People* v. *Leahy, supra,* 8 Cal.4th at p. 612.) In our case the trial court expressly noted that it had looked both to the *numbers and expertise* of the experts on both sides of the question.

Finally, defendant contends the trial court erred in denying his motion for mistrial made after a follow-up to the *Barney* opinion appeared, *People* v. *Wallace* (1993) 14 Cal.App.4th 651 [17 Cal.Rptr.2d 721], which by defendant's reading held that as of that date there was as yet no general acceptance of the modified ceiling approach. In *Wallace* Dr. Sensabaugh had testified to the statistical likelihood of a DNA match, though there is nothing in the opinion to suggest he had used the modified ceiling approach to achieve his figures. Thus, to the extent that *Wallace* comments on the acceptance or nonacceptance in the scientific community of the modified ceiling approach, those comments are pure dicta and thus not binding.[3] (*People* v. *Milner* (1988) 45 Cal.3d 227, 237 [246 Cal.Rptr. 713, 753 P.2d 669].)

It cannot be an abuse of discretion for the trial court to decline to follow an opinion which is not authority for the proposition before it. Nor did the trial court abuse its discretion in denying the motion for new trial on grounds

[3]Because we find no error in the trial court's application of the *Kelly* standard we need not reach defendant's additional contention that the error was prejudicial to him.

that it had erred in finding the DNA evidence admissible as generally accepted under *Kelly*.

## II. *Prior Arrests or Incarceration**

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III. *Disposition*

The judgment is affirmed in its entirety.

Perley, J., and Reardon, J., concurred.

---

*See footnote, *ante*, page 262.