Filed 5/30/13  P. v. Sneed CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　　　v.<br><br>DENNIS RAY SNEED,<br><br>　　　Defendant and Appellant. | F064257<br><br>(Super. Ct. No. VCF235257)<br><br><br>**OPINION** |

---

### THE COURT\*

APPEAL from a judgment of the Superior Court of Tulare County.  Gary L. Paden, Judge.

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Tiffany J. Gates, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*Before Levy, Acting P.J., Cornell, J. and Peña, J.

# INTRODUCTION

Defendant Dennis Ray Sneed appeals his conviction after a jury found him guilty of multiple counts of child molestation. Specifically, defendant contends his sentence of 230 years is unconstitutional. The court will affirm the judgment.

# PROCEDURAL HISTORY

In an amended information filed October 31, 2011, by the Tulare County District Attorney, defendant was charged with 14 counts of forcible lewd or lascivious acts against a child under the age of 14 years (Pen. Code,[1] § 288, subd. (b)(1); counts 1-14)) and one count of committing a lewd or lascivious act upon a child 14 years old (§ 288, subd. (c)(1); count 15)). As to counts 1, 3, 4, 9, and 13,[2] it was also alleged that defendant had substantial sexual conduct with his victim, then under the age of 14 years. (§ 1203.066, subd. (a)(8).) Lastly, it was further alleged that defendant had been previously convicted of a strike offense. (§§ 667, subds. (b)-(i) & 1170.12, subds. (a)-(d).)

The following day, defendant pled not guilty to all counts and denied all allegations.

On November 4, 2011, a jury found defendant guilty of all counts. It also found true the related special allegations. Defendant's prior strike conviction was found true in a bifurcated proceeding before the trial court on that same date.

On December 20, 2011, defendant was sentenced to a term of 16 years (the upper term of eight years doubled for the strike) on counts 1 through 14; each 16-year term was to run consecutive to the prior term. An additional term of six years was imposed on count 15. Hence, defendant was sentenced to a total of 230 years in prison.

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

[2]The amended information originally included count 15 as alleging a special allegation. However, that allegation was later dismissed by the People.

**FACTS**

*Prosecution's Case*

D. was born in 1994. She was primarily raised in her grandmother's home but went to live with her parents, defendant and Mother, in Visalia when she was 11 years old. C. and M., D.'s older and younger sisters, also lived with their parents in Visalia.

Initially, the family lived in a home on Bridge Street. D. recalled having a nightmare one evening and going into her parents' bedroom as a result. She got in bed with her parents, but Mother eventually left the room. Her father then began to molest D., first touching her vagina over her underwear. Eventually thereafter, defendant forced D. to masturbate and orally copulate him. He also digitally penetrated D., engaged in sexual intercourse with her, and sodomized her.

Mother abandoned the family after they moved to a home on Giddings Street. Before she left, however, D. told Mother about the abuse. But when her father denied doing anything and became angry, Mother dropped it and left soon after. Her dad continued to sexually abuse her almost every day or every other day.

D. was afraid of her father. Defendant told D. that if she told anyone, he would say that she threw herself at him. D. was also afraid of losing her father, and thus she did not tell anyone else of the abuse.

Eventually D. and her sisters moved back with their grandparents in Monterey County. D. returned to Visalia over Christmas in 2007 to visit her father. He took her to a park with a bridge. Under the bridge, her father "raped" her. On another occasion, defendant traveled to visit the girls when they lived with their grandparents. Defendant took her and M. to a Wal-Mart after giving them gift cards. When M. delayed over her purchases, defendant and D. returned to the car to wait. In the car, defendant digitally penetrated D.'s vagina.

Later, while D. was living in a temporary foster home, defendant took her to a park in Monterey. He attempted to molest her, but D. pushed his hand away and said no.

3.

She was able to do so because she realized she no longer cared if she lost her father, as defendant had not been a true father to her at all.

C. was afraid of her father as well. He had offered her $20 in exchange for oral sex; she was 13 years old at the time. A few months after that incident, C. saw D. sleeping in her father's bedroom clad only in her underwear. Because she was afraid of her dad and did not like to be inside the house on Giddings, C. slept in the backyard in a makeshift fort dug into the side of a hill.

M. recalled living in Visalia with her sisters and her dad. She remembers D. sleeping in her dad's bedroom. On one occasion, M. saw D. in her father's bed. D. was wearing a baggie T-shirt and their father was not wearing any clothing.

Once the abuse came to light and an investigation commenced, D. described a tattoo on her father's penis. The tattoo depicted fire flames. D. was able to draw the flames precisely upon a penis depicted on a piece of paper. C. knew her father had a tattoo on his penis, but she had never seen it.

Detective Osvaldo Dominguez with the Visalia Police Department interviewed defendant. When confronted with D.'s statements, defendant denied everything. He said his children had never seen him naked, and he had not seen them naked since they were babies. Neither had the girls been knowingly or inadvertently exposed to sexual acts or conduct. D. was never naked in his bedroom, and she was only in the room to watch television. When told D. could describe the tattoo on his penis, defendant indicated that was not possible because she had never seen it. While he did not specifically speak with his daughters about his penis tattoo, they could have overheard him speaking about it with his wife, or joking about it. According to the detective, defendant expressly denied sodomizing D., stating "'I don't even like ass. That's just sick.'"

### Defense Case

Jennifer Orange lived with defendant and his daughters for about a year and a half after Mother left. Orange observed defendant interact with his daughters. D. did not appear fearful or sad; she had a good relationship with her father. While she lived with

the family, Orange worked the graveyard shift. She was home during the day but left for work at about 11:00 p.m. and would return the next morning.

Cheryl Moore was married to defendant in March 2007. They separated in late 2008. Moore observed defendant interact with his daughters also. D. was neither bothered by nor afraid of defendant. Moore did observe inappropriate behavior on D.'s part. D. always wanted to kiss defendant and "she would throw … a violent outraging fit" if she did not get to spend time with her father. Moore recalled describing D.'s relationship with her father as awkward while speaking with the detective; she attributed this to D.'s age and her desire to kiss defendant on the lips. Moore also recalled C. and M. telling her they had heard moaning coming from defendant's bedroom. With regard to sleeping arrangements, defendant's girls slept in one room together. Moore testified that C. did not sleep in the backyard fort.

Defendant testified in his own behalf. He denied ever touching his daughter inappropriately and testified that D.'s statements are not true.

Moreover, C.'s testimony with regard to his offering her $20 was not true. Rather, defendant explained that at that time C. had been going to the park a lot. She would then come home with a new bike or rollerblades, and once came home with $20. He was concerned she was offering sexual favors in return for the items or money. She became angry with him when he confronted her about it.

When Mother called him and told him the girls had accused him of raping them, he left work immediately and went home. He confronted the girls, but they said they were playing or joking. He has never done anything inappropriate or sexual with any of his children.

Defendant is extensively tattooed. And, because tattooing is a hobby, he often drew flames, a specialty of his. The same type of flames can be seen on his arms and on his penis. He taught the girls how to draw flames. D. was particularly interested in his hobby; she would often watch when people came to the house to get a tattoo. D. has

5.

never seen the tattoo on his penis, but the fact he had a tattoo there was common knowledge.

Defendant believes these allegations arose because the girls are angry with him for sending them back to live with their grandmother. When he was released from prison and regained custody of the girls, he promised them he would never let them go. But when he lost his job, he could no longer afford to take care of them. Before he sent them to live with their grandmother, defendant got along well with his daughters.

Once the girls moved to Monterey County, D. never returned to visit defendant in Visalia. The bridge incident never happened.

On cross-examination, defendant claimed all three of his girls took the stand and lied. Defendant admitted not advising the detective that he had taught his daughters how to draw flames. The detective had not asked him and it did not occur to defendant to bring it up.

## DISCUSSION

### I. Defendant's Sentence Is Not Cruel or Unusual

Defendant contends the sentence imposed violates the federal and state constitutional prohibitions against cruel and unusual punishment because (1) his conduct was not violent; (2) it is impossible to serve a sentence of 230 years; and (3) his conduct is similar to that of a resident child molester, upon whom a sentence of 32 years would have been imposed. Plaintiff contends defendant has forfeited this claim for purposes of appeal. In any event, plaintiff maintains the sentence is neither cruel nor unusual.

The federal Constitution's Eighth Amendment prohibits cruel and unusual punishment; that is, punishment that involves "unnecessary and wanton infliction of pain" or is "grossly out of proportion to the severity of the crime." (*Gregg v. Georgia* (1976) 428 U.S. 153, 173; see also *Ewing v. California* (2003) 538 U.S. 11, 23.)

The California Constitution's prohibition of cruel or unusual punishment prohibits imposing a criminal sentence which is "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human

dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424; see Cal. Const., art. I, § 17; *People v. Dillon* (1983) 34 Cal.3d 441, 478.)

"A defendant has a considerable burden to overcome when he challenges a penalty as cruel or unusual. The doctrine of separation of powers is firmly entrenched in the law of California and the court should not lightly encroach on matters which are uniquely in the domain of the Legislature." (*People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 529.) The court uses a three-pronged approach to determine whether a particular sentence is grossly disproportionate. First, it reviews "the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society." (*In re Lynch*, *supra*, 8 Cal.3d at p. 425.) Second, it compares the challenged punishment with punishments prescribed for more serious crimes in its jurisdiction. (*Id.* at p. 426.) Third, it compares the challenged punishment to punishments for the same offense in other jurisdictions. (*Id.* at p. 427; see also *Ewing v. California*, *supra*, 538 U.S. at p. 22.) The importance of each of these prongs depends upon the facts of each specific case. (*In re Debeque* (1989) 212 Cal.App.3d 241, 249.) Indeed, the court may base its decision on the first prong alone. (*People v. Dillon*, *supra*, 34 Cal.3d at pp. 479, 482–488.)

## A.      Waiver or Forfeiture

Initially, the court notes that defendant failed to object to his sentence on the grounds it constituted cruel and unusual punishment. Claims of cruel and unusual punishment in violation of constitutional standards involve fact-specific determinations about the offense and the offender and must be raised in the trial court to avoid waiver. (*People v. Norman* (2003) 109 Cal.App.4th 221, 229; *People v. Kelley* (1997) 52 Cal.App.4th 568, 583; *People v. DeJesus* (1995) 38 Cal.App.4th 1, 27.)

At sentencing, defendant argued that the 230-year sentence was "impractical" and "unnecessary," and that it "serve[d] no practical purpose." He suggested the court impose the mitigated term of six years on each of the 14 counts, plus an additional two-year term for count 15, for a total of 86 years. Defendant never claimed the sentence would violate the constitutional prohibitions against cruel and/or unusual punishment,

7.

and did not address the necessary fact-specific determinations typically addressed in such a claim. We conclude therefore that defendant has waived the issue. (*People v. Kelley*, *supra*, 52 Cal.App.4th at p. 583.) Nonetheless, even assuming the issue had been preserved, the claim lacks merit.[3]

### B. Nature of the Offense and the Offender

Defendant contends his conduct was not violent, and he focuses on his lengthy sentence, noting that such a sentence is "impossible for a human to serve." He also contends an individual convicted of premeditated murder, a more serious crime, will likely receive a sentence of only 25 or 50 years to life in prison. Lastly, he contends "a more cogent analysis in lewd act cases is comparing the sentence a resident child molester would have received for the same or similar conduct."

This nature of the offense and the offender inquiry "focuses on the particular person before the court, and asks whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*People v. Dillon*, *supra*, 34 Cal.3d at p. 479.) The offenses committed by defendant demand a long period of confinement to protect the residents of a civilized society. Defendant was convicted of 15 counts of lewd and lascivious conduct over a period of years, the victim his own daughter. Defendant's conduct progressed from first touching D.'s vagina over her underwear, to sodomizing her before she began menstruating, to intercourse. D. testified that once the abuse began, the contact occurred every day or every other day. Defendant

---

[3]Defendant also asserts this claim should be "addressed on the merits to forestall an inevitable ineffective assistance of counsel claim." An appellant bears the burden of showing that counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors and omissions, it is reasonably probable that the result of the proceeding would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 693-694.) Yet, defense counsel is not required to make futile objections or advance meritless arguments. (*People v. Jones* (1979) 96 Cal.App.3d 820, 827.) As will be explained, defendant's sentence does not violate the California or federal constitutional prohibitions against cruel and/or unusual punishment. Therefore, defense counsel's failure to object on this ground was not unreasonable and defendant was not prejudiced by the omission.

threatened D. that if she told anyone of his actions, he would say she had thrown herself at him. Moreover, defendant never accepted responsibility or expressed remorse for his crimes.[4] It is clear defendant's offenses are extremely serious, and that he poses a serious danger and threat to vulnerable young girls. "It was [defendant's] conduct, not his sentence, that was cruel and unusual." (*People v. Wallace* (1993) 14 Cal.App.4th 651, 666 [non-strikes sentence of 283 years 8 months not cruel or unusual].) "An examination of the nature of the [forcible sex] offenses committed here … reveals that they are of the most serious, violent and heinous crimes imaginable both in the abstract and in the real world." (*People v. Huber* (1986) 181 Cal.App.3d 601, 633 [non-strikes sentence of 106 years 4 months not cruel or unusual].) "In view of the outrageous nature of this type of offense and in view of the danger that these offenses pose to society we cannot say that the imposition of consecutive sentences for multiple sex offenses shocks the conscience and offends fundamental notions of human dignity." (*People v. Bestelmeyer*, *supra*, 166 Cal.App.3d at p. 531 [while non-strikes sentence of 129 years may be the equivalent of a life sentence without the possibility of parole, it was not cruel or unusual for violent sex offender].)

Moreover, defendant received a longer sentence because of his recidivist behavior. His sentence was effectively doubled as a result of a strike prior. Defendant was convicted of first degree burglary in 1997 and served time in prison for that offense, among others. Once paroled, defendant commenced to victimize his own young daughter. In short, considering the nature of defendant's offenses and his criminal history, the sentence he received does not offend fundamental notions of human dignity or shock the conscience. (*In re Lynch*, *supra*, 8 Cal.3d at p. 424.)

---

[4]In fact, when the judge pointed this out during the sentencing proceeding, defendant interrupted, stating, "That's because it never happened."

## C. Punishment for More Serious Crimes in California

Defendant complains the sentence imposed here is a "de facto term of life without parole" and one that "is impossible for a human to serve."

The fact a sentence exceeds a defendant's life expectancy does not necessarily render the sentence constitutionally cruel or unusual. (*People v. Byrd* (2001) 89 Cal.App.4th 1373, 1382-1383; *People v. Ayon* (1996) 46 Cal.App.4th 385, 396-401 [finding 240 years to life sentence, which was functional equivalent of a life sentence without the possibility of parole, did not constitute cruel or unusual punishment], disapproved on other grounds by *People v. Deloza* (1998) 18 Cal.4th 585, 600, fn. 10.) As the court in *Byrd* reasoned: "[I]t is immaterial that defendant cannot serve his sentence during his lifetime. In practical effect, he is in no different position than a defendant who has received a sentence of life without possibility of parole: he will be in prison all his life. However, imposition of a sentence of life without possibility of parole in an appropriate case does not constitute cruel or unusual punishment under either our state Constitution [citation] or the federal Constitution." (*People v. Byrd*, *supra*, at p. 1383.) As noted above, the facts of this case render it appropriate to impose such a sentence.

Further, defendant contends that a premeditated murderer, who may face a sentence of 25 or 50 years to life, will received a sentence "that is unquestionably a lesser sentence" than the 230 years imposed here. Regardless, a sentence imposed for multiple sexual offenses cannot be compared to the sentence imposed for a single act that results in death. (*People v. Estrada* (1997) 57 Cal.App.4th 1270, 1280-1281.) With regard to defendant's contention that his offenses are more akin to those of a resident child molester,

> "[s]ection 288.5 provides that a person who resides in the same home or has recurring access to a child, and who engages in three or more acts of substantial sexual conduct with the child over a period of not less than three months, shall be punished by a prison term of not less than six, twelve, or sixteen years. [¶] Section 288.5 was enacted because of problems of proof that can arise where the molester resides in the same house as the child.

> Under such circumstances the child may recall she was molested repeatedly over a period of time, but may not be able to recall discrete instances with sufficient precision to prove multiple counts. The People, however, are not required to prosecute under section 288.5 in order to gain a conviction against a resident child molester …." (*People v. Johnson* (1995) 40 Cal.App.4th 24, 26.)

The purpose of section 288.5 is to authorize "significant penalties" for resident child molesters where there are problems with proof; it was not intended to limit the sentence for a defendant, who commits multiple offenses, to a single count. (*People v. Johnson*, *supra*, at p. 26.) Here, there were no problems with proof, and the People were not required to prosecute defendant as a resident child molester.

The court in *People v. Weddle* (1991) 1 Cal.App.4th 1190, 1196, explained that it is an "exquisite rarity" for a challenge to proportionality of a sentence to be successful in California. This case does not involve such a rarity. Defendant bears the burden of establishing that his punishment is greater than that imposed for more serious offenses in California. (See *In re DeBeque*, *supra*, 212 Cal.App.3d at pp. 254-255.) He has not done so.

### D. Punishment for Similar Offenses in Other Jurisdictions

The court notes that defendant makes no effort to compare his sentence with punishments in other states for the same offense, which it takes as a concession that his sentence withstands a constitutional challenge on either basis. (*People v. Crooks* (1997) 55 Cal.App.4th 797, 808 [defendant bears burden of establishing disproportionality].)

In sum, although defendant's sentence is lengthy, his conduct was reprehensible and he has not demonstrated that his sentence is grossly disproportionate to his crimes. (*Ewing v. California*, *supra*, 538 U.S. at pp. 20-21; *In re Lynch*, *supra*, 8 Cal.3d at p. 424.)

## II. Clerical Error May Be Corrected

Defendant contends the abstract of judgment erroneously reflects he was convicted of a violation of section 288, subdivision (b) in count 15. He maintains the jury actually found him guilty of a violation of subdivision (c)(1) of that section. Plaintiff concedes

11.

the clerical error. Hence, plaintiff joins defendant in asking the court to modify the abstract of judgment to accurately reflect a violation of section 288, subdivision (c)(1) on count 15.

The court agrees with defendant and accepts plaintiff's concession. Defendant was in fact found guilty of a violation of subdivision (c)(1) of section 288. Accordingly, the abstract of judgment should be corrected to conform with the jury's verdict and the trial court's oral pronouncement as to count 15—that defendant was convicted of a violation of subdivision (c)(1) of section 288. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185-187; *People v. Smith* (2001) 24 Cal.4th 849, 852.)

## DISPOSITION

The judgment is affirmed. The trial court is directed to amend the abstract of judgment to reflect a conviction pursuant to section 288, subdivision (c)(1), on count 15, and transmit a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.