Filed 12/30/20  P. v. Diaz-Garcia CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G058281 |
| v. | (Super. Ct. No. 17WF1447) |
| JOSE LORENZO DIAZ-GARCIA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Cheri T. Pham, Judge.  Affirmed.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael P. Pulos and Joseph C. Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Appellant Jose Lorenzo Diaz-Garcia sexually abused his daughter for a decade, from age 7 to 17, by digitally penetrating her, orally copulating her, having sexual intercourse with her, and sodomizing her.  A jury convicted him of 12 sex offenses, and the trial court sentenced him to a determinate term of 17 years 4 months, to be followed by an indeterminate term of 105 years to life.[1]

He raises two claims on appeal: (1) The trial court prejudicially erred by instructing the jury with CALCRIM No. 1193 because the instruction impermissibly allows a jury to consider expert testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS) as evidence of the truth of the charges, thus unconstitutionally lowering the prosecution's burden of proof; and (2) Because it exceeds his natural lifespan, his lengthy prison sentence constitutes cruel and unusual punishment in violation of both the state and federal constitutions.  We reject both contentions and affirm.

## I.

## FACTUAL BACKGROUND

Diaz-Garcia began molesting his biological daughter, L.D., when she was seven years old.  He would rub and insert his fingers into her vagina, grab and put his

---

[1]     The indeterminate sentence comprised: Three consecutive mandatory 25-years-to-life terms for sexual intercourse or sodomy with a child 10 or younger (Pen. Code, § 288.7, subd. (a) (all further undesignated statutory references are to the Penal Code)); a consecutive mandatory 15 years to life for oral copulation of a child 10 or younger (§288.7, subd. (b)); and a consecutive mandatory 15 years to life for sexual penetration of a child 10 or younger (§288.7, subd. (b)).  The determinate sentence consisted of an upper-term principal term of 8 years for a lewd act on a child under 14 (§ 288, subd. (a)); four consecutive one-third the mid-term subordinate 2-year sentences for the additional lewd act offenses (§ 288, subd. (a)); and two consecutive one-third the mid-term subordinate 8-month sentences for a lewd act on a child 14 or 15 years old at least 10 years younger than the defendant (§288, subd. (c)(1)), and incest with a child 14 years or older (§ 285).

2

mouth on her breasts, and grab and smack her buttocks. At age eight, Diaz-Garcia began putting his penis in her vagina "three times a month minimum."

When L.D. was nine or ten years old, Diaz-Garcia called her into his bedroom and told her that he "wanted to try something." He pulled her pants down, bent her over the edge of the bed, and inserted his penis into her anus.

The frequency of abuse increased as L.D. got older. Starting when she was 10 years old, Diaz-Garcia had vaginal sex with her "a minimum" of three times per week. He also digitally penetrated her vagina or fondled her breasts three or four times per week. When L.D. was 11 or 12 years old, Diaz-Garcia began putting his mouth on her vagina. He did this "three days minimum per week."

After learning Diaz-Garcia's conduct was wrong from watching telenovelas, L.D. asked him to stop. Instead of stopping, Diaz-Garcia started waiting for L.D. to fall asleep before sexually assaulting her. She would wake up to him either having sex with her or performing cunnilingus on her. She would tell him to stop, and "he would stop eventually." She would fall back asleep, only to awaken to him doing it again.

L.D. gave up telling Diaz-Garcia to stop and resigned herself to the abuse. She dealt with it by "pretending nothing was happening." She trained herself to sleep through it and to make herself "feel numb." The abuse continued without interruption until L.D. was 17 years old.

During that time she never told anyone about the abuse. He was her father and she did not want to be the reason he was no longer in the family. She was worried how they could get by financially without him because he was the breadwinner. She also was concerned about possibly losing her mother, who is diabetic, and in stressful times has difficulty breathing and sometimes faints.

Finally, 17-year-old L.D. fell asleep one night in the same bed as her mother and Diaz-Garcia. L.D.'s mother woke up and saw Diaz-Garcia "on top of" L.D.,

3

who was asleep. Diaz-Garcia's arms were "straight, supporting his weight." His pants were at mid-thigh level, and his penis was exposed. L.D.'s pants were at the bottom of her bare buttocks.

L.D.'s mother "beat" Diaz-Garcia; she "wanted to kill him." She asked, "'Why my daughter? There are so many women in the streets. Why my daughter?'" Diaz-Garcia responded it was L.D.'s mother's fault because she was "useless to him." She had not been giving him "what he needed and that's why he was doing it." He promised to never do it again. He promised to "buy a Disneyland pass for [her] sons," and told her to "forget what had happened."

L.D.'s mother asked L.D. if she was okay. At first, L.D. said yes, but then she started crying. She told her mother Diaz-Garcia had been abusing her since she was seven or eight years old. L.D.'s mother "turned crazy." She felt "[d]esperate," and "wanted to kill him" all over again. She called family members and asked for advice on what to do. Her nephews called the police for her.

Diaz-Garcia was interviewed by police and he admitted he "touched [L.D.] inappropriately." He described himself as someone who "didn't even have [his] head on right," "a monster," "sick in the head," and "the bad one." Referring to the incident when he was caught in the act, he said that when he got on top of L.D., he "was going to like if [he] was going to make love," but he denied actually having sex with her.

Detectives confronted Diaz-Garcia with L.D.'s allegation that "he did this to [her] since [she] was little." Diaz-Garcia said, "I can't do anything to go back in time." If "she says that I did it all the time, then I did it all the time[;] what can I do?" When asked why he did it, Diaz-Garcia responded that he felt rejected by his wife and that L.D. was "the only one [who] love[d]" him. He explained that he and L.D. became like "a little couple," starting with simulated sexual intercourse over the clothes when L.D. was 10 years old. He demonstrated with the opening of a tissue box how he would penetrate L.D.'s vagina with his finger at this age. According to Diaz-Garcia, he

4

masturbated and ejaculated on L.D.'s chest "one time" when she was about 14 years old. He performed oral sex on her "one time" when she was about 16 years old. "But like always she was asleep." He said he put his finger inside her vagina "[o]ne time" when she was 17 years old. He insisted, "[b]ut not . . . every week."

When asked how many times he "put [his] penis . . . inside her," Diaz-Garcia responded, "[A]bout five times I think." He corrected himself, saying, "Well and . . . only from what I remember I did it twice, but no more. I don't know if . . . in reality I touched her part there or . . . if it went to the side, I don't know."

## II.

## DISCUSSION

### A. *CALCRIM No. 1193 and CSAAS Evidence*

Diaz-Garcia first contends his convictions must be reversed for instructional error, arguing CALCRIM No. 1193's explication of CSAAS evidence is defective, and unconstitutionally lowers the prosecution's burden of proof. We disagree.

#### 1. *Additional Background*

The prosecutor brought a pretrial motion to admit CSAAS evidence, conditioned on a limiting instruction as to its use. Defense counsel brought a similar motion to exclude such evidence or, in the alternative, to admit it for the limited purpose of "dispel[ling] common misconceptions" about how children react to sexual abuse, and also with a limiting instruction. He proposed CALCRIM No. 1193 as such an instruction.

The trial court ruled the prosecutor could present expert witness testimony on CSAAS. The court cautioned that the testimony would be "limited only to child victims in general;" the expert would "not be connecting the syndrome with the diagnosis of the alleged victim in this case;" and the expert would "not be opining whether sexual abuse actually occurred in this case." The court further told counsel it would instruct with CALCRIM No. 1193 as a limiting instruction.

5

During his cross-examination of L.D. at trial, defense counsel questioned her about her decision to sleep in the same bed with Diaz-Garcia on that final occasion, rather than her own bed.  In addition, he asked her, "[I]n the decade this was happening, you never told anybody, right?"  Counsel inquired as to whether this was so even though she had not been threatened or bribed to keep quiet.  He pressed her further, saying, "[Y]ou never said anything to your mom?"

Dr. Jody Ward, a clinical and forensic psychologist, testified as an expert on CSAAS.  She explained CSAAS is not a disorder or disease, but rather a pattern of behaviors that many sexually abused children exhibit.  CSAAS is helpful in understanding the dynamics of why children do what they do in response to sexual abuse.

She told the jury there are five general manifestations of CSAAS: secrecy, helplessness, entrapment and accommodation, delayed or unconvincing disclosure, and retraction and recantation.  Children, even if not threatened, often keep sexual abuse secret.  "Helplessness" refers to the fact children are completely reliant upon the adults around them for everything, including food, shelter, and clothing.  To deal with the abuse, children often adopt coping behaviors.  One behavior is to "accommodate" the abuse, i.e., go along with it, and then try not to think about it or pretend it never happened.  Because most child sexual abuse — 90 percent — occurs within families or involves close family friends, children often do not want to report what is happening to them because of the loyalty they feel toward their family and the people that care for them.  Research shows two-thirds of people wait until adulthood to report sexual abuse, and many never report it at all.

Dr. Ward acknowledged CSAAS assumes sexual abuse has occurred.  But she explained she was not making any claim sexual abuse had occurred in this case, and emphasized it would be inappropriate to do so.  She explained the purpose of her testimony was not to render an opinion on anyone's guilt or innocence, or to make a clinical diagnosis.  She had not reviewed any of the reports in the present case or talked

to any of the people involved, and was unaware of the underlying facts or charges. She acknowledged she could not determine whether sexual abuse occurred in this case or any other case. She explained, "[T]aking any behavior after the fact and trying to diagnose whether sexual abuse occurred would be improper."

The trial court instructed the jury with a modified version of CALCRIM No. 1193 as follows: "You have heard testimony from Dr. Jody Ward regarding child sexual abuse accommodation syndrome. [¶] Dr. Ward's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [L.D.'s] conduct was inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony." Defense counsel did not object to the instruction or its wording.

### 2. *Standard of Review and Legal Background*

"The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law." (*People v. Posey* (2004) 32 Cal.4th 193, 218.) In this context, "the relevant inquiry is whether there is a reasonable likelihood the jury applied the challenged instruction in a way that violated the Constitution. [Citations.] ""[W]e must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' [Citation.]" [Citations.]"" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 915.) When conducting our inquiry, we examine the challenged jury instruction in the context of all instructions, and not in """artificial isolation.""" (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.) We assess the entire charge to the jury as a whole, and view the challenged instruction in context with the other instructions to determine whether there is a reasonable likelihood the jury applied the challenged instruction in an impermissible manner. (*People v. Jennings* (2010) 50 Cal.4th 616, 677.) We presume the jury followed the court's instructions. (*People v. Edwards* (2013) 57 Cal.4th 658, 746 (*Edwards*).)

7

CSAAS is not new. (See *People v. Bowker* (1988) 203 Cal.App.3d 385, 389, fn. 3 (*Bowker*) [the syndrome dates to at least 1983].) It is well-established that although "expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused . . . it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident — e.g., a delay in reporting — is inconsistent with his or her testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. [¶] The great majority of courts approve such expert rebuttal testimony.' [Citation.]" (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301, fn. omitted (*McAlpin*); see *People v. Munch* (2020) 52 Cal.App.5th 464, 466 (*Munch*) ["CSAAS evidence is a valid and necessary component of the prosecution case in matters involving child abuse"].)

Thus, the prosecution may present expert testimony relating to CSAAS when the defense calls into question an abuse victim's credibility because of delayed reporting. (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745 (*Patino*) [victim's credibility was in issue due to "paradoxical behavior," including delay in reporting molestation].) As such, the testimony is admissible to dispel specific myths or misconceptions by pointing out victims of childhood sexual abuse, as a group, often delay reporting abuse and this behavior is not inconsistent with having been molested. (See *People v. Julian* (2019) 34 Cal.App.5th 878, 885 (*Julian*).)

Where a defense attorney at the outset of trial places the credibility of the victim at issue, the prosecution may offer CSAAS evidence in its case-in-chief to explain to the jury why a child victim would delay reporting the abuse. (*Patino, supra*, 26 Cal.App.4th at p. 1745 [admission of CSAAS evidence "is not error merely because it was introduced as part of the prosecution's case-in-chief rather than in rebuttal. The

8

testimony is pertinent and admissible if an issue has been raised as to the victim's credibility"].)

3. *Analysis*

Here, during his cross-examination, defense counsel confronted L.D. several times with the fact she never had told anyone what her father was doing to her as it progressed over the 10 years of abuse until the final episode, when her mother witnessed it and asked her if she was alright. The obvious implication of counsel's questions was to impliedly suggest the abuse did not happen as she claimed. In other words, it was to impeach her credibility.

Consequently, the CSAAS evidence was *relevant* to "'rehabilitate [her] credibility when the defendant suggest[ed] that [her] conduct after the incident – e.g., a delay in reporting – [was] inconsistent with [her] testimony claiming molestation.'" (*Julian, supra*, 34 Cal.App.5th at p. 885.) Similarly, Dr. Ward's testimony was *admissible* to "'disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.'" (*McAlpin, supra*, 53 Cal.3d at p. 1301.)

Moreover, this is not a case where the prosecution improperly introduced CSAAS evidence to support the truth of the molestation claims. (Compare *Bowker, supra*, 203 Cal.App.3d at pp. 394-395.) Rather, here the record shows the CSAAS evidence was presented to the jury in a manner narrowly tailored to inform the jury that counterintuitive reactions to abuse, including delayed reporting, were not uncommon for child molestation victims. Dr. Ward's testimony went no further than that.

Thus, instead of attacking the CSAAS evidence itself, Diaz-Garcia insists the court's limiting instruction was flawed. He argues the language of CALCRIM No. 1193 is prejudicially misleading in two respects.

"First, where the defendant's guilt turns on the complaining witness's credibility, it is *impossible* to allow the jury to use expert testimony about CSAAS 'in

9

evaluating the believability of [the complaining witness's] testimony' . . . without allowing them to use it as proof that the complaining witness is telling the truth." (Italics added.) We do not find the contention persuasive.

At the outset, Diaz-Garcia's argument proves too much. If it were indeed valid, i.e., if it were *impossible* for a jury to use the CSAAS evidence for its limited purpose, then *no* limiting instruction could ever be devised to eliminate the possibility the jury would disregard it and misuse the CSAAS evidence as proof the charges were true. That would include the alternate instruction, CALJIC 10.64, Diaz-Garcia implies more correctly instructs the jury on the limited use of CSAAS evidence. It would also entail that CSAAS evidence could never be constitutionally *admissible* because it would be "impossible" for a jury to use it properly. This, of course, is simply not the law, and Diaz-Garcia provides nothing to support such a radical departure from established authority.

Furthermore, in a virtually identical case, *People v. Gonzales* (2017) 16 Cal.App.5th 494 (*Gonzales*), Dr. Ward told a Ventura County jury: "CSAAS is not a tool to help diagnose whether a child has actually been abused. . . . [I]f it is not known whether a child has been abused, CSAAS is not helpful in determining whether a child has, in fact, been abused. The purpose of CSAAS is to understand a child's reactions when they have been abused." (*Id*. at pp. 503-504.) And just as here, the *Gonzales* jury was instructed with CALCRIM No. 1193, limiting the purpose for which the jury could use Dr. Ward's testimony. (*Id.* at p. 503.)

Like Diaz-Garcia, the *Gonzales* defendant argued "it is impossible to use the CSAAS testimony to evaluate the believability of [the victim's] testimony without using it as proof that [the defendant] committed the charged crimes." (*Gonzales*, *supra,* 16 Cal.App.5th at p. 503.) The court rejected the contention, and concluded, "Ward's testimony made it clear CSAAS evidence is not evidence [defendant] did anything . . . [and] CALCRIM No. 1193 was proper and did not violate due process." (*Id.* at p. 504.)

In *Munch, supra,* 52 Cal.App.5th 464, the same court explained further its holding in *Gonzales*: "[W]e rejected these contentions in *People v. Gonzales*. [Citation.] . . . There we said, 'The purpose of CSAAS is to understand a child's reactions when they have been abused. [¶] A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the expert's] testimony to conclude that [the child's] behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use [the expert's] testimony to conclude [the child] was, in fact, molested. The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior. Thus, under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that [the child's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction.'" (*Id.* at p. 474, italics omitted.) So too here.

Here, the trial court instructed the jury to "[p]ay careful attention to all of [the] instructions and consider them together" (CALCRIM No. 200). The court admonished the jury that "certain evidence was admitted for a limited purpose," and to "consider that evidence *only* for that purpose and for no other" (CALCRIM No. 303, italics added). Furthermore, CALCRIM No. 1193 told the jury the CSAAS evidence was not evidence Diaz-Garcia molested L.D., and to consider that evidence "*only*" for the limited purpose of determining whether L.D.'s conduct was inconsistent with the conduct of a child who had been molested "and in evaluating the believability of her testimony" about her molestations. We presume the jury followed the court's instructions. (*Edwards, supra,* 57 Cal.4th at p. 746), and Diaz-Garcia points to nothing in the record to rebut that presumption.

While it is true that evidence for evaluating an alleged molestation victim's believability may ultimately assist the jury in determining whether to credit his or her statements that molestations did occur, the same may be said of any evidence that is

11

admitted solely on the issue of a witness's credibility. But that does not mean it lessens the burden of proof.

Next, Diaz-Garcia argues that "because [CALCRIM No. 1193] refers only to 'the crimes *charged* against' the defendant, the instruction does not preclude the jury from using CSAAS evidence as proof the defendant committed *uncharged* crimes described by the complaining witness, from which the jury would then naturally infer that the defendant had also committed the charged crimes." (Italics added.) We are not persuaded.

As discussed, "[a] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." (*Boyde v. California* (1990) 494 U.S. 370, 378.) "Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting." (*Id.* at pp. 380-381.)

Moreover, this same argument was also made and rejected in *Gonzales.* There the defendant argued "CALCRIM No. 1193's statement that CSAAS testimony is not evidence he committed 'the crimes charged against him' does not preclude the use of CSAAS testimony as proof he committed the *uncharged* offenses. The uncharged offenses can lead to the conclusion that [the defendant] is inclined to commit sexual offenses. [The defendant] believes the instruction is not only wrong as a matter of law, but denies him due process by lightening the prosecution's burden of proof." (*Gonzales*, *supra,* 16 Cal.App.5th at p. 504, italics added.)

But, as the *Gonzales* court pointed out, use of the CSAAS testimony as evidence a defendant committed uncharged offenses would violate CALCRIM No. 1193's specific instruction that CSAAS testimony is not to be viewed as evidence he

committed *any* offenses, charged or uncharged. (See *Gonzales*, *supra,* 16 Cal.App.5th at p. 504.) Moreover, Dr. Ward's testimony itself made it clear CSAAS evidence is not evidence Diaz-Garcia did *anything*, whether charged or uncharged. (*Ibid.*) We concur.

Expert CSAAS testimony "is admissible to rehabilitate [a] witness' credibility when the defendant suggests that the [witness's] conduct after the incident . . . is inconsistent with his or her" molestation claims. (*McAlpin, supra,* 53 Cal.3d at p. 1300.) CALCRIM No. 1193 properly limits the jury's consideration of the CSAAS evidence to its permissible purpose, and no other purpose. It is not reasonably likely the jury understood CALCRIM No. 1193 as allowing it to use the evidence for the impermissible purpose of determining the molestations occurred or that other, uncharged, abuse took place. Rather, the jury most likely understood the instruction as permitting it to consider the CSAAS evidence solely for the purpose of evaluating L.D.'s testimony in light of the evidence she did not report her molestation until 10 years after it began, and how that might seem inconsistent with the conduct of a child who had been molested for a decade.

Consequently, CALCRIM No. 1193 does not violate due process or misapply the burden of proof. (*Gonzales, supra*, 16 Cal.App.5th 494 at pp. 503-504; *Munch, supra,* 52 Cal.App.5th at p. 474; cf. *McAlpin, supra*, 53 Cal.3d at pp. 1300-1301.) We therefore hold CALCRIM No. 1193 fairly instructed the jury on the proper use — and limitations on the use — of CSAAS evidence in this case. There was no instructional error.

B. *Constitutionality of Diaz-Garcia's Sentence*

Diaz-Garcia next contends his sentence violates his state and federal constitutional rights to be free from cruel or unusual punishments because he cannot possibly serve it during his lifetime. We discern no constitutional violation.

1. *Background*

Before sentencing, L.D. presented a victim impact statement. She spoke of the mental anguish her father had caused her and told the court: "I have been mentally and physically hurt. My innocence has been taken away at only seven years old by my own blood father. [¶] . . . [¶] I suffered in silence for 10 years, and I kept quiet from my family because I didn't want them to hurt the way I was hurting." "I went into major depression. I had to take antidepressants and was diagnosed with PTSD. I have tried to commit suicide about three to five times last year and had to go into a mental facility about three times in order for me to get help."

In his sentencing brief, defense counsel argued that, given the lack of "physical harm, a weapon, physical violence, or sadism," "a life sentence . . . would constitute cruel and unusual punishment pursuant to the Eighth Amendment to the United States Constitution and Article I, Section 6 [*sic*] of the California Constitution." [2] The trial court disagreed, and carefully outlined the relevant factors supporting its findings that the maximum sentence in this case did not violate either constitution's limitations. Diaz-Garcia does not challenge those findings on appeal.

The trial court found Diaz-Garcia "deserving of the maximum sentence prescribed by the law," and as noted above, imposed it. (See *ante*, fn. 1.)

2. *Standard of Review*

"We independently review whether a punishment is cruel or unusual, considering any underlying disputed facts in the light most favorable to the judgment." (*People v. Avila* (Nov. 30, 2020, B294632) __Cal.App.5th__, __; *People v. Baker* (2018) 20 Cal.App.5th 711, 721-722 (*Baker*).) In doing so, we must be mindful that the "power

---

[2]     Article I, section 17 of the California Constitution provides: "Cruel or unusual punishment may not be inflicted." The Eighth Amendment to the United States Constitution prohibits infliction of "cruel and unusual punishments." It is applicable to the states by virtue of the due process clause of the Fourteenth Amendment. (*Robinson v. California* (1962) 370 U.S. 660, 667.)

14

to define punishment for crimes is a legislative function, so we proceed with deference when there is a constitutional challenge to the length of a prison term." (*People v. Bernal* (2019) 42 Cal.App.5th 1160, 1173.)  Thus, "the power to declare a legislatively prescribed punishment unconstitutional should be rarely exercised." (*Baker, supra,* 20 Cal.App.5th at p. 720.)  Moreover, "'great deference is ordinarily paid to legislation designed to protect children, who all too frequently are helpless victims of sexual offenses.'" (*Id.* at p. 729.)  "It is well within the prerogative of the Legislature to determine that sex offenses against young children are deserving of longer sentences than sex offenses against adults or nonsex offenses." (*People v. Gomez* (2018) 30 Cal.App.5th 493, 502 [mandatory 15 years to life for a § 288.7, subd. (b), offense not unconstitutional].)

        3. *Analysis*

        Diaz-Garcia does not challenge the trial court's conclusions regarding the constitutional issues raised below.  Instead, his only contention is that any sentence which cannot be served in a defendant's natural lifetime is constitutionally cruel and unusual punishment.  His sole authority for this claim is Justice Mosk's opinions expressing his view that "[a] sentence . . . that cannot possibly be completed in the defendant's lifetime makes a mockery of the law and amounts to cruel or unusual punishment." (*People v. Hicks* (1993) 6 Cal.4th 784, 797 (dis. opn of Mosk, J.); see also *People v. Deloza* (1998) 18 Cal.4th 585, 600 (conc. opn. of Mosk, J.) [same].)  We are not convinced.

        First, "'no opinion has value as a precedent on points as to which there is no agreement of a majority of the court.'" (*People v. Byrd* (2001) 89 Cal.App.4th 1373, 1383 (*Byrd*).)  No other justice joined in Justice Mosk's dissent in *Hicks* or his concurrence in *Deloza*, rendering his opinions in those cases of no precedential value. (*Ibid.*)

        Second, the practical effect of Diaz-Garcia's sentence in this matter is that he received the functional equivalent of a sentence of life without possibility of parole.

15

(See *Byrd, supra*, 89 Cal.App.4th at p. 1383.) And imposition of a sentence of life without possibility of parole in an appropriate case does not constitute cruel or unusual punishment under either our state Constitution or the federal Constitution. (*Ibid.*; *People v. Young* (1992) 11 Cal.App.4th 1299, 1308-1311; see *Harmelin v. Michigan* (1991) 501 U.S. 957 [life without possibility of parole for possession of 672 grams of cocaine did not violate the 8th Amendment].) Diaz-Garcia provides no case that has found a sentence constitutes cruel and unusual punishment merely because it exceeded the possible lifetime of an adult offender. Nor have we found one.

"[I]t is immaterial that defendant cannot serve his sentence during his lifetime. In practical effect, he is in no different position than a defendant who has received a sentence of life without possibility of parole: he will be in prison all his life. However, imposition of a sentence of life without possibility of parole in an appropriate case does not constitute cruel or unusual punishment." (*Byrd, supra*, 89 Cal.App.4th at p. 1383.)

Lengthy prison sentences have routinely been found constitutional. (See, e.g, *Byrd, supra*, 89 Cal.App.4th at p. 1383 [sentence of 115 years plus 444 years to life constitutional; rejecting arguments based on Mosk, J.'s opinions ]; *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1222, 1231 [135 years to life for multiple child molestations constitutional; same rejection]; see also *People v. Sullivan* (2007) 151 Cal.App.4th 524, 572-573 [210 years to life]; *People v. Cartwright* (1995) 39 Cal.App.4th 1123, 1130, 1132, 1134-1137 [53 years plus 375 years to life for 19 sexual assaults of three women]; *People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 531 [129-year sentence for 25 sex crimes against 11-year-old stepdaughter].)

The goals of criminal punishment include vindication of society's sense of justice, protecting society from criminal harms, and deterring criminal behavior. (See *People v. Mesce* (1997) 52 Cal.App.4th 618, 632 [the "classic concerns of sentencing" are "retribution, deterrence, and incapacitation"].) Here, Diaz-Garcia's repeated, long-

16

term, predatory sexual assaults affected L.G. at an extremely vulnerable time in her life, leading to lifelong consequences for her. The sentence imposed for Diaz-Garcia's decade-long series of heinous crimes, inflicted on the most vulnerable of victims — his own daughter — reflects society's most severe condemnation of such offenses, provides an equally strong deterrent message, and ensures he will never have an opportunity to reoffend.

Simply put, it was Diaz-Garcia's "conduct, not his sentence, that was cruel and unusual." (*People v. Wallace* (1993) 14 Cal.App.4th 651, 666 [283 year, 8 month sentence for multiple sex crimes was constitutional].) This is not one of those "rarest of cases" in which the legislatively-mandated sentence was constitutionally excessive. (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494.) Accordingly, we conclude Diaz-Garcia's punishment is neither cruel nor unusual. The mere fact he cannot serve the entirety of his sentence during his lifetime does not affect that conclusion.

## III.

## DISPOSITION

The judgment is affirmed.

ARONSON, ACTING P. J.

WE CONCUR:

THOMPSON, J.

GOETHALS, J.

17