Filed 8/23/24  P. v. Farias CA2/8
Opinion following transfer from Supreme Court

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B314347 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA486911) |
| v. | |
| MARTIN FARIAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Eleanor J. Hunter, Judge.  Affirmed as modified.

Derek K. Kowata, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan S. Pithey, Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

This case is before us again on remand from the California Supreme Court.  Martin Farias appealed from his judgment of conviction of three counts of lewd act upon a child under the age of 14 (Pen. Code,[1] § 288, subd. (a)), and one count of oral copulation or sexual penetration of a child 10 years old or younger (§ 288.7, subd (b)).  On appeal, Farias contended:  (1) the charging information did not provide adequate notice that he was subject to three 25-year-to-life terms under the "One Strike" law (§ 667.61); (2) the trial court erred in admitting expert testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS); (3) the trial court erred in instructing the jury on CSAAS evidence with CALCRIM No. 1193; (4) Farias's total sentence of 90 years to life constituted cruel and unusual punishment; and (5) the abstract of judgment did not accurately reflect his presentence custody credit.  In our original opinion, we concluded that the abstract of judgment did not correctly reflect Farias's actual custody credit, but otherwise rejected his claims.  We modified the abstract of judgment to provide for one additional day of actual custody credit, and affirmed the judgment as modified.

The California Supreme Court granted Farias's petition for review.  Following its decision in *In re Vaquera* (2024) 15 Cal.5th 706 (*Vaquera*), the Supreme Court returned the case to us with directions to vacate our prior decision and reconsider the appeal in light of *Vaquera*.  In *Vaquera,* the Supreme Court considered

---

[1]  Unless otherwise stated, all further statutory references are to the Penal Code.

2

whether an accusatory pleading provided a defendant with fair notice of the specific One Strike sentence that the prosecution was seeking. Although we allowed both parties an opportunity to file supplemental briefs, only the People did so. After considering the Supreme Court's decision in *Vaquera* and the People's brief, we reach the same disposition as set forth in our original opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Evidence at trial

Farias and his wife, Silvia M., have three children together, including a daughter, V.F. Silvia also has an older daughter from her previous relationship, A.R., who was raised in the same household as her half-siblings. The offenses in this case concern Farias's sexual abuse of A.R. between 2002 and 2009, and his sexual abuse of V.F. between 2011 and 2013.

#### A. Sexual abuse of A.R.

A.R., born in 1995, is Farias's stepdaughter. Farias sexually molested A.R. for the first time when she was seven years old. On that occasion, Farias called A.R. into his bedroom and had her lie down beside him. He placed A.R.'s hand on his penis, first over and then under his clothing. He then made A.R. rub his penis with her hand.

Farias sexually molested A.R. again when she was about 14 or 15 years old. Around that time, there were three to four occasions when Farias kissed A.R. with his tongue and touched her breasts over her clothing. When A.R. was 16 or 17 years old, Farias called A.R. into his bedroom. He told her to lock the door and to lie down on the bed. Farias then pulled down A.R.'s pants and underwear, and orally copulated her. This incident was the last time that Farias sexually abused his stepdaughter. A.R. moved out of the family's home when she was 17 years old.

3

**B. Sexual abuse of V.F.**

V.F., born in 2006, is Farias's biological daughter. Farias's sexual abuse of V.F. began when the child was five years old. On that occasion, V.F. was sitting near her father on a couch in the living room and told him that she was cold. Farias motioned to V.F. to give him her hand. He then unbuttoned his pants, slid V.F.'s hand under his clothing, and placed her hand on his penis. V.F. began to feel that this contact was not appropriate and removed her hand after a few minutes. She did not tell anyone about the incident at that time because she was very young and felt confused about her father's behavior.

About a month later, Farias brought V.F. into his bedroom. As they watched television together on the bed, Farias began to caress V.F.'s arm, and asked her to lie down between his legs. Once V.F. had done so, Farias told the child that she had hurt him and asked her if she wanted to make him feel better. Farias then instructed V.F. to rub his penis. V.F. briefly complied, but stopped because she again felt uncomfortable and confused.

On another occasion when V.F. was five years old, Farias invited the child to his bedroom. While lying on the bed, Farias caressed V.F.'s body, including her arm, thighs, and chest. He told the child to lie on her back, pulled off her pants and underwear, and orally copulated her. Farias then pulled down his shorts and tried to push V.F.s mouth onto his penis. When Farias forced V.F.'s lips to touch his penis, she backed away and said she needed to use the restroom. V.F. hid inside the restroom until other family members arrived home.

Following that incident, V.F. tried to avoid Farias and to never be alone with him. On two other occasions, Farias asked V.F. to go to his bedroom with him and then began to caress her

4

body.  V.F. immediately moved away from Farias, and he stopped.  V.F. never spoke with her father about the sexual abuse.

### C.    Disclosure of sexual abuse

A.R. first tried to disclose Farias's sexual abuse to her mother, Silvia, when she was 15 years old.  After A.R. got drunk at a party, Farias told A.R. to go to Silvia so that her mother could smell her breath.  As Silvia and A.R. fought about her underage drinking, A.R. told Silvia that Farias had kissed her.  Because A.R. was intoxicated at the time, Silvia sent her to bed.  When Silvia talked to A.R. the following morning, A.R. disclosed that Farias had kissed her on the mouth.  Silvia then took A.R. to Farias and confronted him about what A.R. had said.  Farias responded that A.R. was confused, and that he only would kiss her on her cheek.  He also gave A.R. a manipulative look, which she understood to mean that Silvia would not believe her and she would break the family apart by making this accusation.  At that point, A.R. told Silvia that what she had said was untrue, and that she had made the statement solely because she was drunk.

In April 2020, when V.F. was 13 years old, she was on a website, video chatting with a stranger.  When Silvia saw V.F., she told her to get off the website and warned her about the dangers of talking to strangers on the internet because there were "so many predators out there."  In response, V.F. stated that "bad people were not always on the outside, sometimes they were inside the house."  When Silvia asked her what she meant by that statement, V.F. disclosed that Farias had sexually abused her starting when she was about five years old.  Silvia hugged V.F. and assured her daughter that she believed her.

5

Silvia immediately reported the sexual abuse to her sister, who in turn reached out to A.R. After A.R. arrived at the family's home, she spoke with Silvia and learned of V.F.'s disclosure about Farias. At that time, A.R. told her mother that the same thing had happened to her. A.R. then met privately with V.F. in her bedroom. V.F. repeated the disclosure to A.R., and A.R. revealed to V.F. that she also had been sexually abused by Farias. The family then contacted the police.

### D.    CSAAS evidence

Dr. Jayme Jones, a clinical psychologist, testified for the prosecution as an expert witness on CSAAS. As described by Dr. Jones, CSAAS is a model to help explain the behavior of sexually abused children whose disclosure patterns tend not to follow the common expectation that children will disclose abuse immediately. There are five components of the CSAAS model: (1) secrecy; (2) helplessness; (3) accommodation; (4) delayed disclosure; and (5) recantation.

Dr. Jones testified that secrecy and helplessness describe the context in which child sexual abuse occurs. Because the abuse typically takes place outside the presence of witnesses, it signals to children they are not supposed to disclose what has happened. Moreover, because children are physically smaller than their abusers and taught to obey adults, they feel helpless to fight back against the abuse. Accommodation describes how children develop coping mechanisms, such as not thinking about the abuse, that allow them to continue with their daily lives.

Dr. Jones further testified that most victims of child sexual abuse never disclose the abuse, and when they make a disclosure, it is often years after the abuse occurred. About 10 to 15 percent of victims disclose the abuse within the first year of its

6

occurrence, and another 20 to 25 percent of victims disclose the abuse within the next five years. The younger the child is when first abused tends to correlate with a longer delay in disclosure. Additionally, the longer the abuse lasts, the less likely it is to be disclosed. When victims disclose abuse, they often do so in small parts, and depending upon how their disclosure is received, they may report more information or stop altogether. Children who disclose abuse also may recant for a variety of reasons. Children are more likely to recant if they do not feel supported, or if the court or child welfare agency becomes involved in the matter.

Dr. Jones acknowledged that CSAAS is not a diagnosis, but rather a model developed to assist therapists and families in understanding why children may delay in disclosing sexual abuse. The model only applies to children who have actually been abused, and it is not used to determine whether abuse has occurred. Dr. Jones had never met A.R. or V.F., and did not know any of the facts of this case. She was not asked to offer an opinion about these alleged victims, but rather to testify about the disclosure patterns of sexually abused children in general.

## II. Jury verdict and sentencing

The jury found Farias guilty of three counts of lewd act upon a child under the age of 14 (§ 288, subd. (a)), and one count of oral copulation or sexual penetration of a child 10 years old or younger (§ 288.7, subd. (b)). The jury also found true the three enhancement allegations that Farias committed the offense of lewd act upon a child against more than one victim who was under the age of 14. (§ 667.61.)

The trial court sentenced Farias to a total term of 90 years to life in state prison, consisting of 25 years to life on each count for lewd act upon a child under the age of 14; and 15 years to life

7

on the count for oral copulation or sexual penetration of a child 10 years old or younger.  Farias was awarded 532 days of presentence custody credit.

Farias timely appealed.

## DISCUSSION

## I.    Adequate notice of One Strike sentence

Farias claims that his sentence of 25 years to life on each count for lewd act upon a child under the age of 14 violated his due process rights, because he did not receive sufficient notice that he would be sentenced under the One Strike law pursuant to section 667.61, subdivision (j)(2).  In particular, he contends that the charging information failed to expressly plead that he was subject to a 25-year-to-life enhancement under section 677.61, subdivision (j)(2), for committing the offense against more than one victim who was under the age of 14.  Applying the principles set forth in *Vaquera*, we conclude Farias received constitutionally adequate notice of his One Strike sentence.

### A.    Governing law

Section 667.61, known as the One Strike law, creates an alternative, harsher sentencing scheme for certain enumerated sex offenses committed under specified circumstances.  (*Vaquera*, *supra*, 15 Cal.5th at p. 713.)  "When the prosecution is pursuing sentencing under the One Strike law, the jury decides first whether the prosecution has proved the elements of the charged offense; if the jury convicts, it then independently considers whether the prosecution has proved the circumstances alleged to support sentencing under the One Strike law." (*Ibid*.)

Subdivision (c) of section 667.61 identifies the qualifying offenses, which include lewd or lascivious conduct in violation of section 288, subdivision (a).  (§ 667.61, subd. (c)(8).)  Subdivision

8

(e) specifies the qualifying aggravating circumstances, including where a defendant has been convicted of committing the offense against more than one victim.  (*Id*., subd. (e)(4).)

As relevant here, subdivision (a) of section 667.61 provides that, subject to the exception in subdivision (j), a person convicted of a qualifying offense "under two or more of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for 25 years to life." (*Id*., subd. (a).)  Subdivision (b) states that, except as provided in subdivision (a) or (j), a person convicted of a qualifying offense "under one of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for 15 years to life." (*Id*., subd. (b).)

Subdivision (j) sets forth an exception to the requirement that there must be two or more aggravating circumstances under subdivision (e) for a defendant to be subject to the longer 25-year-to-life term mandated by subdivision (a).  (§ 667.61, subd. (j)(2).) Specifically, subdivision (j)(2) provides that "[a] person who is convicted of an offense specified in subdivision (c) under one of the circumstances specified in subdivision (e), upon a victim who is a child under 14 years of age, shall be punished by imprisonment in the state prison for 25 years to life."  (*Ibid*.)

In *Vaquera*, our Supreme Court decided whether a One Strike allegation in a charging information provided a defendant with fair notice that the prosecution was seeking a sentence of 25 years to life under section 667.61, subdivision (j)(2), based on the age of the victim, rather than 15 years to life under subdivision (b) based on the multiple victim circumstance alone. (*Vaquera*, *supra*, 15 Cal.5th at p. 720.)  The Court held that "to satisfy due process, an accusatory pleading must inform the

9

defendant that the prosecution is relying on specific facts to support imposition of a particular One Strike sentence." (*Id.* at p. 719.)  However, the Court also emphasized that "[a]n accusatory pleading need not specify the number of the pertinent sentencing statute, so long as it otherwise clearly notifies the accused of the factual basis on which it is seeking a longer sentence and the information necessary to calculate sentencing exposure." (*Id.* at pp. 719–720.)

The Court then explained that, in the One Strike law context, " '[a]dequate notice can be conveyed by a reference to the description of the qualifying circumstance' in the One Strike allegation accompanied by either a general 'reference to section 667.61' or a more specific reference to the relevant subdivision of section 667.61.  [Citation.]  If a One Strike allegation describes the specific factual circumstance based on which the prosecution seeks One Strike sentencing and cites to section 667.61, [it] does not necessarily need to specify the sentence . . . or cite to the specific subdivision of section 667.61 that provides the applicable enhanced penalty.  [Citations.]  Similarly, a One Strike allegation need not specify the factual basis of the sentence the prosecution is seeking if the allegation's text otherwise makes clear that the prosecution intends to rely on the facts alleged in connection with the underlying count to seek imposition of a specific One Strike sentence on that count." (*Vaquera*, *supra*, 15 Cal.5th at p. 720.)  Determining whether an accusatory pleading provides fair notice of a One Strike sentence accordingly "requires a careful analysis of the language of the One Strike allegation." (*Id.* at p. 724.)

In *Vaquera*, the language of the One Strike allegation read in full:  " 'As to count(s) 2, it is further alleged pursuant to Penal Code sections 667.61(b)/(e)(4), that in the commission of the above

10

offense, [Vaquera] committed an offense specified in Penal Code section 667.61(c) against more than one victim.' " (*Vaquera, supra*, 15 Cal.5th at p. 714.)  The Supreme Court concluded that this allegation failed to provide fair notice that the prosecution was seeking a 25-year-to-life sentence under the One Strike law based on the age of the victim.  (*Id*. at p. 725.)  The Court noted that the allegation did not include a citation to subdivision (j)(2), specify that the victim was under 14 years old, or "otherwise make clear that the prosecution was seeking a longer sentence based on the victim's age." (*Vaquera*, at p. 725.)  Instead, "the allegation's citations to subdivisions (b) and (e)(4), combined with its invocation of the qualifying circumstance that [defendant] committed the covered offense 'against more than one victim,' suggest[ed] the prosecution was seeking a sentence of 15 years to life based on the multiple victim circumstance." (*Id*. at p. 721.)  Because the pleading as a whole failed to inform the defendant of the prosecution's election to seek the more stringent sentence, it violated his due process right to fair notice of his sentencing exposure under the One Strike law.  (*Id*. at pp. 724–725.)

The Court in *Vaquera* also provided examples of how the prosecution could have provided fair notice of its intent to seek a 25-year-to-life sentence under section 667.61, subdivision (j)(2). (*Vaquera, supra*, 15 Cal.5th at p. 725.)  As described by the Court, "[t]he prosecution could have briefly alleged in the One Strike law allegation the factual circumstances on which it was relying ([the defendant] having been convicted in the present case of committing violations of section 288, subdivision (a) against multiple victims and the victim being under the age of 14) and cited to the One Strike law generally (§ 667.61)." (*Vaquera*, at p. 725.)  As an alternative, "the prosecution could have cited to

11

subdivision (j)(2) and referenced the charge in count 2 (§ 288, subd. (a)), an essential element of which is that the victim was under 14 years old and the multiple victim circumstance (§ 667.61, subd. (e)(4))." (*Vaquera*, at p. 725.) "Alternatively, had the prosecution specified in the One Strike allegation that it was seeking 25 years to life on [the qualifying count] and alleged the factual circumstances on which it was relying to support that sentence, that would have provided fair notice even without a citation to subdivision (j)(2)." (*Ibid.*)

**B.  Farias received fair notice that he was subject to the 25-year-to-life enhancement**

In this case, Farias was convicted of three counts of lewd act upon a child under the age of 14 in violation of section 288, subdivision (a).  Two of the counts were for the offenses against V.F., and one count was for the offense against A.R.  As to each count, the jury also found true the section 667.61 enhancement allegation that the offense was committed against more than one victim and against a child who was under the age of 14.  Thus, as to each of these counts, Farias was subject to a term of 25 years to life under section 667.61, subdivision (j)(2) if he received fair notice that the prosecution was seeking that particular sentence.

Applying *Vaquera*, we conclude the charging information provided Farias with fair notice that, as to each lewd act count, the prosecution was seeking a sentence of 25 years to life under section 667.61, subdivision (j)(2) based on the age of the victim. The information charged Farias in counts 1, 2, and 4 with committing a lewd act upon a child under the age of 14 in violation of section 288, subdivision (a).  The information "further alleged, within the meaning of Penal Code sections 667.61(a) and (d), as to defendant, MARTIN FARIAS, as to count(s) 1, 2, [and] 4

12

. . . that the following circumstances apply:  The defendant committed one of the specified offenses pursuant to 667.61(c) with a child under 14 and with more than one victim."  Unlike the One Strike allegation in *Vaquera*, which made no reference to the age of the victim, the allegation here specified that Farias committed the qualifying offense "with a child under 14."  Based on the plain language of the allegation, Farias was on notice that the prosecution was relying on the specific factual circumstance that the victim was under the age of 14 in seeking One Strike sentencing.

Further, the face page of the information stated that each lewd act count included an allegation under "PC 667.61(a)/(d)," and that the effect of such allegation was a "25 to Life State Prison" term.  The information therefore expressly provided that, under section 667.61, Farias was subject to the more stringent term of 25 years to life on each of those counts.  This is in contrast to the accusatory pleading in *Vaquera*, which failed to indicate that the defendant was facing a potential 25-year-to-life sentence under the One Strike law.  While Farias's information did not include a specific reference to subdivision (j)(2), the Supreme Court has made clear that "due process does not require 'rigid code pleading or the incantation of magic words.' " (*Vaquera, supra*, 15 Cal.5th at p. 719.)  Rather, "[t]o satisfy due process, it is sufficient for an accusatory pleading to provide the defendant fair notice of the particular One Strike sentence the prosecution is seeking and of which facts it intends to prove to support that sentence." (*Id.* at p. 720.)

In this case, the information satisfied due process under the standard articulated in *Vaquera*.  The One Strike allegation cited to section 667.61, and set forth the particular facts that the

13

prosecution intended to prove to support the imposition of the longer sentence—that Farias committed a violation of section 288, subdivision (a) against multiple victims and that the victims were under the age of 14. The information further made clear that each lewd act count included a section 667.61 enhancement allegation that could subject Farias to a term of 25 years to life in state prison. On this record, Farias received adequate notice that the prosecution was seeking a 25-year-to-life sentence for each qualifying offense under section 667.61, subdivision (j)(2).

## II. Admission of CSAAS evidence

Farias argues that his judgment of conviction must be reversed because the trial court erroneously admitted CSAAS evidence in violation of his constitutional right to due process and a fair trial. Farias further asserts that, to the extent he forfeited this claim by failing to timely object to the evidence at trial, he received ineffective assistance of counsel. We conclude the CSAAS evidence was properly admitted, and thus, Farias's ineffective assistance of counsel claim fails.

### A. Governing law

An expert may give opinion testimony "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) "The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion." (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)

It has long been held that expert testimony on CSAAS is admissible for the limited purpose of disabusing the jury of common misconceptions about how child victims may react to

14

sexual abuse. (See *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301; *People v. Lapenias* (2021) 67 Cal.App.5th 162, 171; *People v. Munch* (2020) 52 Cal.App.5th 464, 468; *People v. Perez* (2010) 182 Cal.App.4th 231, 245; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744–1746; *People v. Bowker* (1988) 203 Cal.App.3d 385, 394–395.) As the California Supreme Court explained over 30 years ago, CSAAS evidence is "not admissible to prove that the complaining witness has in fact been sexually abused; [however,] it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*McAlpin*, at pp. 1300–1301, fn. omitted.)

To be admissible, CSAAS testimony "must be targeted to a specific 'myth' or 'misconception' suggested by the evidence." (*People v. Bowker*, *supra*, 203 Cal.App.3d at pp. 393–394.) However, identifying the relevant myth or misconception does not require "the prosecution to expressly state on the record the evidence which is inconsistent with the finding of molestation. It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation." (*People v. Patino*, *supra*, 26 Cal.App.4th at pp. 1744–1745.) The prosecution may offer CSAAS testimony in its case-in-chief whenever the testimony of the victim may raise an "obvious question . . . in the minds of the jurors" as to the victim's credibility, such as "why the molestation was not immediately reported if it had really occurred." (*Id*. at p. 1745.)

15

**B.  The trial court did not abuse its discretion in admitting the CSAAS evidence**

Farias challenges the admission of Dr. Jones's CSAAS testimony on several grounds.  He contends that the evidence was irrelevant because CSAAS did not apply to the facts of this case and there are no longer misconceptions about child sexual abuse to correct.  He further argues that Dr. Jones's specific testimony regarding the statistical data on delayed disclosure was improper and invaded the role of the jury.  In addition, he asserts that the CSAAS evidence should have been excluded in its entirety because it does not satisfy the requirements for the admissibility of new scientific evidence.  Finally, he claims that admission of the testimony violated his due process rights. We conclude that none of these arguments has merit.

In this case, the CSAAS evidence was relevant because both complaining witnesses, V.F. and A.R., delayed in disclosing the sexual abuse for a number of years, and A.R. also recanted shortly after her first attempted disclosure.  The evidence at trial showed that Farias began abusing V.F. when she was about five years old, and A.R. when she was about seven years old.  V.F. did not disclose the abuse to her mother until she was 13 years old. A.R. first tried to disclose the abuse to her mother when she was 15 years old, but she only reported that Farias had kissed her and then recanted the following day.  It was not until 10 years later when she was informed of V.F.'s disclosure that A.R. shared with the family that Farias had also sexually abused her. The CSAAS evidence was thus admissible to help explain why a sexually abused child might not disclose the abuse for many years.  It also was admissible to help explain why a child who eventually discloses sexual abuse might only reveal small

16

portions of information at a time, or recant if the child does not feel supported in making the disclosure.

The CSAAS testimony in this case was also properly limited in scope. Prior to the introduction of the evidence, the trial court instructed the jury that Dr. Jones's testimony was not evidence that Farias committed any of the crimes charged against him. During the testimony, Dr. Jones explained that she had never met or evaluated either V.F. or A.R., and did not know any of the facts of this case. Dr. Jones never offered an opinion, nor was she asked to offer an opinion, as to whether the evidence in this case was consistent with CSAAS. Rather, her testimony was confined to dispelling commonly held misconceptions about how a child may react to sexual abuse.

In support of his argument that the public no longer holds the misconceptions that CSAAS testimony is intended to address, Farias cites to cases from some out-of-state courts concerning the admissibility of such evidence. He also claims that "[h]undreds of episodes of Law and Order SVU, which deals with victims of sex offenses[,] have made these crimes and the reactions of children to those crimes well known." Suffice it to say, we are not persuaded. As one appellate court recently explained in rejecting a similar argument, "CSAAS evidence has been admitted by the courts of this state since the 1991 *McAlpin* decision. . . . [¶] That Supreme Court decision is binding on all lower courts in this state. [Citation.] That other jurisdictions may disagree with it does not change its impact on California cases." (*People v. Munch, supra*, 52 Cal.App.5th at p. 468; see *People v. Lapenias, supra*, 67 Cal.App.5th at p. 172 [rejecting claim that CSAAS testimony is no longer necessary because the public no longer harbors misconceptions about child sexual abuse].)

17

We accordingly adhere to Supreme Court precedent on the admissibility of CSAAS evidence in cases such as this one.

Farias also argues that, even if CSAAS evidence may be admissible for a limited purpose, Dr. Jones's testimony on the statistics of delayed disclosure was improper because it invaded the jury's role as the sole arbiter of credibility. In support of this argument, Farias cites to two California cases in which the Court of Appeal concluded that a CSAAS expert's testimony about the statistical data on *false allegations* was inadmissible. (See *People v. Julian* (2019) 34 Cal.App.5th 878, 885 [expert testified that rate of false allegations ranged from one to eight percent]; *People v. Wilson* (2019) 33 Cal.App.5th 559, 568 [expert testified that false allegations were found in one to six percent of cases].) In both cases, however, the expert's testimony about the infrequent rate of false allegations invaded the province of the jury because it had the effect of vouching for the veracity of the alleged victims. As one court explained, the expert effectively told jury that "there was at least a 94 percent chance that any given child who claimed to have been sexually abused was telling the truth. And, although [the] testimony on this point was not expressly directed to either [victim], the practical result was to suggest to the jury that there was an overwhelming likelihood their testimony was truthful." (*Wilson*, at p. 570.)

In contrast, the CSAAS expert in this case did not provide any testimony about the percentage of children who falsely allege sexual abuse, or whether such occurrences were rare. Rather, Dr. Jones testified that, among the population of children who have been victims of sexual abuse, about 10 to 15 percent disclose the abuse within the first year of its occurrence, and another 20 to 25 percent disclose the abuse within the next five years.

Dr. Jones also made clear that the CSAAS model "only applies to children who have been abused," and thus, if there is "a false accusation, the model doesn't fit." In fact, when defense counsel specifically inquired about the incidence of false allegations on cross-examination, Dr. Jones explained there was not reliable data on the subject, and declined to opine on the likelihood that an allegation of sexual abuse would be false. Dr. Jones's testimony on the statistical data concerning delayed disclosure was well within the scope of admissible CSAAS evidence.

Farias further contends that the CSAAS evidence should have been excluded because it does not satisfy the requirements of *People v. Kelly* (1976) 17 Cal.3d 24 and *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013. The *Kelly* rule, formerly known as the *Kelly/Frye* rule, governs the admissibility of evidence based on a new scientific method, which requires a showing that the method is generally accepted as reliable within the relevant scientific community. (*People v. Lapenias*, *supra*, 67 Cal.App.5th at p. 173.) California courts repeatedly have concluded, however, that the *Kelly* rule does not apply to CSAAS evidence. (See *ibid.*; *People v. Munch*, *supra*, 52 Cal.App.5th at pp. 472–473; *People v. Harlan* (1990) 222 Cal.App.3d 439, 449; *People v. Gray* (1986) 187 Cal.App.3d 213, 218–219.) This is because "CSAAS testimony does not purport to provide a definitive truth; rather, the expert testimony attempts to disabuse jurors of misconceptions they might hold about the conduct of children who have been sexually abused. In short, expert CSAAS testimony is not ' " 'scientific' " evidence' subject to the *Kelly* rule." (*Lapenias*, at p. 173.)

We also reject Farias's claim that the admission of the CSAAS testimony deprived him of due process and a fair trial.

19

"[R]eviewing courts have routinely held the admission of CSAAS evidence does not violate due process." (*People v. Lapenias*, *supra*, 67 Cal.App.5th at p. 174; see *People v. Patino*, *supra*, 26 Cal.App.4th at p. 1747 ["introduction of CSAAS testimony does not by itself deny [a defendant] due process"].) Here, Dr. Jones's testimony was relevant to the issues presented at trial and was limited in scope. Because the trial court properly admitted the CSAAS evidence, Farias's counsel was not ineffective in failing to object to it.[2]

## III.    Jury instruction on CSAAS evidence

Farias next contends that his judgment of conviction must be reversed because the trial court erred in instructing the jury with CALCRIM No. 1193, the pattern jury instruction on CSAAS evidence. He specifically claims that the instruction lessens the prosecution's burden of proof because it permits the jury to use

---

[2]        " ' " 'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome.' " ' " (*People v. Johnson* (2016) 62 Cal.4th 600, 653.) Where, as here, an objection to the evidence would have been properly overruled, defense counsel's failure to make such objection does not fall below an objective standard of reasonableness. (See *People v. Peterson* (2020) 10 Cal.5th 409, 465 [counsel's performance was not deficient for failing to object where "any such objection would have been meritless and properly overruled"]; *People v. Bell* (2019) 7 Cal.5th 70, 127 [counsel was not ineffective for "failing to raise a futile objection"].) Farias's ineffective assistance of counsel claim therefore also fails.

CSAAS evidence as corroboration for the victim's allegation of abuse. We conclude this claim likewise lacks merit.

### A. Standard of review

A claim of instructional error is subject to de novo review. (*People v. Scully* (2021) 11 Cal.5th 542, 592.) An appellate court independently reviews the wording of a challenged instruction and assesses whether the instruction accurately states the law. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) "When a defendant claims an instruction was subject to erroneous interpretation by the jury, he must demonstrate a reasonable likelihood that the jury misconstrued or misapplied the instruction in the manner asserted." (*People v. Covarrubias* (2016) 1 Cal.5th 838, 926.) A single instruction may not be judged in isolation, but must be considered in the context of the instructions as a whole and the trial record. (*People v. Lemcke* (2021) 11 Cal.5th 644, 655.)

### B. The trial court did not err in instructing the jury with CALCRIM No. 1193

CALCRIM No. 1193, as given in this case, instructed the jury: "You have heard testimony from Dr. Jayme Jones regarding child sexual abuse accommodation syndrome. [¶] Dr. Jones's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him or any conduct or crimes with which he was not charged. [¶] You may consider this evidence only in deciding whether or not [V.F.] and [A.R.'s] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony."

Contrary to Farias's contention on appeal, CALCRIM No. 1193 does not misstate the law or lessen the prosecution's burden of proof. The instruction explicitly states that CSAAS

testimony is not evidence that the defendant committed the charged crimes. It further sets forth the only permissible uses for such evidence, which are to evaluate the credibility of the alleged victim and to determine whether his or her conduct was consistent with that of a sexually abused child. Appellate courts thus have rejected similar challenges to CALCRIM No. 1193, and concluded that the language of the instruction accurately describes the proper use, and limitations on the use, of CSAAS testimony. (See *People v. Lapenias*, *supra*, 67 Cal.App.5th at pp. 175–176; *People v. Munch*, *supra*, 52 Cal.App.5th at pp. 473–474; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503–504.) We agree with the reasoning in those cases. Because there is no reasonable likelihood that the jury misconstrued or misapplied the instruction in the manner asserted by Farias, the trial court did not err in instructing the jury on the use of CSAAS evidence with CALCRIM No. 1193.

## IV. Claim of cruel and unusual punishment

Farias argues that his aggregate sentence of 90 years to life violates the federal and state constitutional bans on cruel and unusual punishment because it is tantamount to a sentence of life without the possibility of parole. Because Farias did not assert this objection in the trial court, he has forfeited the claim on appeal. (See *People v. Burgener* (2003) 29 Cal.4th 833, 886 [defendant forfeited Eighth Amendment claim "by failing to articulate an objection on federal constitutional grounds" below]; *People v. Speight* (2014) 227 Cal.App.4th 1229, 1247 ["defendant's failure to contemporaneously object that his sentence constitutes cruel and unusual punishment forfeits the claim on appellate review"].) Even if not forfeited, however, the claim fails.

22

### A. Governing law

A sentence violates the federal Constitution only if it is grossly disproportionate to the severity of the crime. (*Graham v. Florida* (2010) 560 U.S. 48, 60; *Ewing v. California* (2003) 538 U.S. 11, 23.) The Eighth Amendment " 'does not require strict proportionality between crime and sentence.' " (*Graham*, at p. 60.) Hence, " 'outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare.' " (*Ewing*, at p. 21.)

A sentence violates the California Constitution if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424.) To determine whether a sentence is cruel or unusual as applied to a particular defendant, a reviewing court generally " 'must examine the circumstances of the offense, including motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including his or her age, prior criminality, and mental capabilities.' " (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1300.) Successful challenges to a sentence as cruel or unusual punishment under California law also "are extremely rare." (*People v. Perez* (2013) 214 Cal.App.4th 49, 60.) " 'Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment.' " (*People v. Gomez* (2018) 30 Cal.App.5th 493, 499.)

### B. Farias's sentence is not constitutionally cruel or unusual

Farias challenges the constitutionality of his sentence on the grounds that it serves no rational legislative purpose because a sentence of 90 years to life cannot possibly be served within his lifetime, and thus amounts to life in prison without the possibility of parole. Numerous courts have concluded, however, that the fact that a sentence exceeds a defendant's life expectancy does not necessarily render it constitutionally cruel or unusual. (See, e.g., *People v. Byrd* (2001) 89 Cal.App.4th 1373, 1382–1383 [upholding sentence of 115 years plus 444 years to life despite defendant's inability to serve sentence during his lifetime]; *People v. Cartwright* (1995) 39 Cal.App.4th 1123, 1135–1136 [upholding sentence of 375 years to life plus 53 years for series of violent sexual assaults]; *People v. Wallace* (1993) 14 Cal.App.4th 651, 666–667 [upholding sentence of 283 years and 8 months for 46 sex offenses against seven victims]; *People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 531–532 [upholding sentence of 129 years for 25 sex crimes against one victim].) As the court in *Byrd* explained: "[I]t is immaterial that defendant cannot serve his sentence during his lifetime. In practical effect, he is in no different position than a defendant who has received a sentence of life without possibility of parole: he will be in prison all his life. However, imposition of a sentence of life without possibility of parole in an appropriate case does not constitute cruel or unusual punishment under either our state Constitution [citation] or the federal Constitution." (*Byrd*, at p. 1383.)

Although Farias's sentence may be severe, comparing it with the gravity of his offenses does not give rise to an inference of gross disproportionality. Farias committed multiple sexual

offenses against his daughter and his stepdaughter.  He began sexually abusing V.F. when she was five years old and A.R. when she was seven years old.  The abuse continued over a considerable length of time.  At Farias's sentencing, the trial court heard statements from both victims about the trauma that they suffered as a result of their father's sexual abuse.

Moreover, Farias's sentence on three of the four counts was imposed under the One Strike law, which as discussed, mandates an indeterminate life sentence where the defendant committed a sexual offense against more than one victim and against a child under the age of 14.  (§ 667.61, subd. (j)(2).)  The mandatory nature of the One Strike law "reflects the Legislature's zero tolerance toward the commission of sexual offenses against particularly vulnerable victims."  (*People v. Alvarado* (2001) 87 Cal.App.4th 178, 200–201.)  "It is well within the prerogative of the Legislature to determine that sex offenses against young children are deserving of longer sentences than sex offenses against adults or nonsex offenses."  (*People v. Gomez, supra,* 30 Cal.App.5th at p. 502; see *People v. Baker* (2018) 20 Cal.App.5th 711, 729 [" 'great deference is ordinarily paid to legislation designed to protect children, who all too frequently are helpless victims of sexual offenses' "].)  Given the severity of his offenses, Farias has not shown that his sentence is so harsh as to shock the conscience or to offend fundamental notions of human dignity.  He has therefore failed to demonstrate that his punishment is constitutionally cruel or unusual.

## V.    Presentence custody credit

Lastly, Farias contends, and the People concede, that the judgment must be modified to accurately reflect Farias's presentence custody credit.  At sentencing, Farias was awarded

25

532 days of presentence custody credit, consisting of 463 days of actual custody credit and 69 days of conduct credit. However, because Farias spent 464 days in custody prior to sentencing, he is entitled to one additional day of actual custody credit for a total presentence custody credit of 533 days. The abstract of judgment must be modified accordingly.

## DISPOSITION

The judgment is modified to award Farias a total of 533 days of presentence custody credit, consisting of 464 days of actual custody credit and 69 days of conduct credit. As modified, the judgment is affirmed. The superior court is directed to prepare an amended abstract of judgment, and to forward a certified copy to the Department of Corrections.

VIRAMONTES, J.

WE CONCUR:

STRATTON, P. J.

GRIMES, J.

26